# Exhibit P

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
WYATT WAGNER,

                                Plaintiff,

-v-                              6:25-cv-659

COPENHAGEN CENTRAL SCHOOL DISTRICT,
et al.

                               Defendant.
--------------------------------------------------------x


**EVIDENTIARY HEARING TRANSCRIPT**
**BEFORE THE HONORABLE BRENDA K. SANNES**
August 27, 2025
100 South Clinton Street, Syracuse, NY 13261


For the Plaintiff:

  BY:  **WYATT WAGNER, PRO SE**

For the Defendants:

    HANCOCK ESTABROOK
    1800 AXA Tower I
    100 Madison Street
    Syracuse, New York 13202
    BY:  **GIANCARLO FACCIPONTE, ESQ.**


*Hannah F. Cavanaugh, RPR, CRR, CSR, NYACR, NYRCR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York 13261-7367*
*(315) 234-8545*


AA-404

2

I N D E X   O F   T E S T I M O N Y

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| Marissa Corbett | 5 | 6 | 12 | |
| Luke Monnat | 13 | 18 | 30 | 33 |
| K.W. | 34 | 36 | | |
| Scott Connell | 38 | 50 | | |
| Wyatt Wagner | 65 | 67 | | |
| Stephanie Grad | 81 | 87 | | |
| John Kunz | 91 | 94 | | |
| Amanda Root | 95 | 100 | | |

PROCEEDINGS                                                    3

(Open court.  Time noted:  10:03 a.m.)

THE COURTROOM DEPUTY:  The Court calls Wagner versus Copenhagen Central School District, et al., for an evidentiary hearing, case 25-CV-659.

Can the parties please state your appearances for the record starting with the plaintiff?

MR. WAGNER:  Wyatt Wagner.

THE COURT:  Good morning.

MR. FACCIPONTE:  Good morning, your Honor.  Giancarlo Facciponte from Hancock Estabrook.  I am here with defendant and representative of the district, Superintendent Scott Connell.

THE COURT:  Good morning to you both.  And we're here today for a hearing on Mr. Wagner's motion for emergency injunctive relief.

And let me just say in general, a party seeking a temporary restraining order must make a showing of likelihood of irreparable harm in the absence of preliminary relief and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of the hardship tips in the plaintiff's favor, or if relying on sufficiently serious questions that it tips decidedly in the plaintiff's favor and, also, that the injunction is in the public interest.

As a preliminary matter, let me address Mr. Wagner's motion for sanctions.  That's Docket No. 40.

PROCEEDINGS                                        4

And, Mr. Wagner, I've reviewed your motion and I do understand your argument, but I deny your motion for sanctions. There is a factual dispute about what happened in November of 2024. Both parties can present their testimony and exhibits and that the factual dispute will be decided by the factfinder. So the motion for sanctions, Docket No. 40, is denied.

A preliminary injunction is an extraordinary and drastic remedy and should not be granted unless the movant, by a clear showing, carries the burden of persuasion. I'm citing to *St. Joseph's Hospital Health v. American Anesthesiology of Syracuse*, 131 F.4d 102 at 106, a Second Circuit case from 2025.

Since Mr. Wagner has the burden of proof, I'll let you begin by presenting your witnesses and the defendant can then cross-examine your witnesses, and then the defendant can present his witnesses and you can cross-examine his witnesses.

So, Mr. Wagner, you may call your first witness.

MR. WAGNER: Can I call Marissa Corbett?

THE COURT: Yes. Is she in the courtroom?

THE COURTROOM DEPUTY: You can come right up here. Can you please state and spell your name for the record?

THE WITNESS: Yes, it's Marissa Corbett, M-A-R-I-S-S-A, C-O-R-B-E-T-T.

THE COURTROOM DEPUTY: Thank you. Please raise your right hand.

M A R I S S A   C O R B E T T, called as a witness

MARISSA CORBETT - DIRECT EXAMINATION BY MR. WAGNER          5

and being duly sworn, testifies as follows:

THE COURTROOM DEPUTY:  Thank you.  You can be seated.  And there's cups of water if you need them.

THE WITNESS:  Thank you.

THE COURT:  And you may proceed, Mr. Wagner.

MR. WAGNER:  Okay.

DIRECT EXAMINATION BY MR. WAGNER:

Q.  Ms. Corbett, in November of 2024, you required 4H students to walk laps as a consequence, correct?

MR. FACCIPONTE:  Objection, your Honor, to the relevancy of the proceeding or the merits of the underlying claim.

THE COURT:  Overruled.  I'll allow a little examination into this issue.

MR. FACCIPONTE:  Thank you, Judge.

THE COURT:  You may answer the question.

THE WITNESS:  Yes, students were not allowed to use P.E. equipment for one day, correct.

BY MR. WAGNER:

Q.  Correct.

What was the -- what was the reason behind the consequence?

A.  Students misused P.E. equipment during 4H time, so the consequence -- I held students accountable.  And if they weren't using the P.E. equipment the right way, then they were not allowed to use it for one P.E. class.

Q.   So you were disciplining them for something that did not happen under your direct supervision or during your class time?

A.   They were using school equipment.

Q.   Was it in front of you when it happened?

A.   They were not under my supervision.  I did walk into the gym during the activity because it was after school, so I did see them, but, no, it was not under my direct supervision.

MR. FACCIPONTE:  Also, your Honor, I just want to continue my objection to relevancy now that we're hearing about her motivation for discipline.

THE COURT:  Okay.  Anything further from, Ms. Corbett?

BY MR. WAGNER:

Q.   Are you familiar with the SHAPE America National Standards for Physical Educators?  It's Exhibit H.

MR. FACCIPONTE:  Same objection, your Honor.

THE COURT:  Sustained.  Sustained.

MR. WAGNER:  We can move on.

THE COURT:  Okay.  Are you finished with Ms. Corbett?

MR. WAGNER:  Yes.

THE COURT:  Okay.  Cross-examination?

MR. FACCIPONTE:  Thank you.

CROSS-EXAMINATION BY MR. FACCIPONTE:

Q.   Good morning, Marissa.

A.   Good morning.

Q.   Can you please tell me what position you held with the Copenhagen Central School District in the 2024-2025 school year?

A.   I was an elementary physical education teacher.

Q.   Thank you very much.

As part of your duties as an elementary physical education teacher for the district in that time, did you need to supervise the equipment that was in the gymnasium for the elementary school?

A.   Yes.

Q.   Was it part of your duties to make sure that equipment was safely secured and stored away when not in use by a class directed by a teacher?

A.   Yes, yes.

Q.   Did there come a time in November of 2024 where you saw students from -- I'm sorry, not students -- when you saw children who were participating in a 4H program using equipment in the gymnasium?

A.   Yes.

Q.   At -- after you saw that, what did you do with that information?

A.   After I saw that happen, the next morning, I came in and the equipment was not put where I left it at the end of the school day, so I reached out to the elementary principal and asked them if I was able to hold the students accountable by having them not use P.E. equipment for one P.E. class.

Q.   Thank you.

Did you say, "not use P.E. equipment for one P.E. class?" That was the only consequence that you suggested?

A.   Correct.

Q.   Okay.  So you did not require students to run laps?

A.   No, I did not require students to run laps.

Q.   Okay.

A.   No, they did the warm up with the class and then once we got into the activity, which for the day was small side volleyball games over a net, since they weren't using equipment and since during P.E. we want them to be active, they were just asked to walk around.  There was no requirement of running laps, it was just to keep them moving.

Q.   Understood.

Now, after you sent that message to the elementary school principal, did you receive a reply?

A.   I spoke with her in person.

Q.   Okay.  Can you describe that conversation for me and what happened next?

A.   Yeah, I explained to her the situation.  I said, it's been -- it's an ongoing issue.  And I knew that the 4th grade 4H group were the ones using the equipment, so I knew it was them that didn't put it away the right way or misusing it, and so I asked her -- and I told her, you know, we hold students to a high standard and we expect them to treat things the right way

no matter what during P.E. and outside of P.E., because it was in the gym.  She agreed with me.

I also spoke to the classroom teachers about it before, just to make sure it was okay if I pulled them aside because I know that it was on the classroom teacher's time.

Q.  Understood.

A.  And so our elementary principal was on board and both classroom teachers were on board, and that's when I pulled the students aside and we had that conversation.

Q.  Just for clarity of the record, can you please identify the elementary school principal referenced, as well as the two classroom teachers referenced in your prior answer?

A.  You're asking for their names?

Q.  Yes.

A.  Yeah, the elementary principal is Pam Ratliff and then both fourth grade teachers were Heather Adsit and Lindsey Shaw.

Q.  Understood.

So when you say you hold the students -- the students were pulled out of class, are you indicating that these students were participating in the 4H program, separately and aside, were also students of the district?

A.  Yes.

Q.  Okay.  Thank you.

And so, to your knowledge, the district's code of conduct applies to both students and non-students anyway on the district

MARISSA CORBETT - CROSS-EXAMINATION BY MR. FACCIPONTE    10

property, correct?

A.    Correct.

Q.    Okay.  Now, after you had the conversation with the principal and the two classroom teachers that you've just described and spoke with the students as you just described, can you tell us what, if anything, occurred next regarding that November 24th gym equipment issue?

A.    So after that was -- I saw them on the 6th of November.  November 7th I had the conversation with them.  And the majority of the kids were on board, they agreed, yes, this happened, they were okay with it, everybody was okay.  Half of the students -- so they have P.E. every other day, so only half of the students had P.E. that day, so they did the walking, it was fine.  And the next thing was I got an e-mail that evening from Wyatt.

Q.    For clarity, though, I have not heard you mention Wyatt Wagner in any of your prior answers until now.

A.    Mm-hmm.

Q.    Okay.  Did you ever speak with him, interact with him, hear from him, anything, any contact ever from or to Mr. Wagner regarding this gym equipment issue until that e-mail?

A.    No.

Q.    Okay.

A.    I only spoke -- no, I only spoke to our principal about it.

Q.    Thank you.

     And did the principal indicate to you in any way what, if

anything, was communicated to Mr. Wagner at all?

A.   She said that she would reach out to John and -- from there, yeah.

Q.   John, can you give me a last name, please?

That's okay if you can't.  I don't want you to speculate.

Do you remember where John was employed?

A.   4H.

Q.   Okay.  Thank you very much.

And you -- well, withdrawn on that.

After the principal informed you of what steps she would take --

A.   Mm-hmm.

Q.   -- did you have -- and the consequence was effectuated as you described, did you have any further contact with any of your school administrators about this issue?  In other words, did you talk to anyone in the administration further about the gym equipment issue after you heard from the principal what you just described?

A.   After the situation was taken care of?

Q.   Yes.

A.   I don't think we talked any further about it, no.

Q.   Thank you very much.

Did you ever hear from Mr. -- besides that e-mail, did you ever speak to Mr. Wagner personally at any time?

A.   No.

Q.   Okay.  Did you ever see Mr. Wagner personally during those events where the gym equipment was out?

A.   Like, did I ever see him in school?

Q.   Did you see him in the gym at the same time that the equipment was on the ground in November of 2024 or anything like that?

A.   I saw him in the gym with the students.

Q.   Okay.  Was Mr. Wagner, to your observation, aware that the students were using the school's gym equipment?

A.   Can you repeat that?

Q.   Sure.

When you saw Mr. Wagner with those students in the gym, did you see anything that would make you believe he was aware that they were using the gym equipment, such as the students using the gym equipment in front of him?

A.   Yes, he was aware.

Q.   Okay.

MR. FACCIAPONTE:  I don't think I have any further questions.  Thank you, your Honor.

THE COURT:  Okay.  Thank you.

Anything further, Mr. Wagner?

REDIRECT EXAMINATION BY MR. WAGNER:

Q.   Is there any specific policies that you know of that allow you to use physical education as a punishment?

MR. FACCIPONTE:  Just objection to form, your Honor.

LUKE MONNAT - DIRECT EXAMINATION BY MR. WAGNER          13

THE COURT:  Sustained.

MR. WAGNER:  That's all.

THE COURT:  Okay.  You're excused.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  And, Mr. Wagner, you may call your next witness.

MR. WAGNER:  I'll call the school resource officer, Luke Monnat.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  Good morning.  Please state and spell your name for the record.

THE WITNESS:  Luke Monnat, L-U-K-E, M-O-N-N-A-T.

THE COURTROOM DEPUTY:  Please raise your right hand.

L U K E   M O N N A T, called as a witness and being duly sworn, testifies as follows:

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  You may proceed, Mr. Wagner.

DIRECT EXAMINATION BY MR. WAGNER:

Q.   How were you first made aware of the November 2024 incident involving myself and Superintendent Connell?

A.   Well, is that when you were -- that was with the Ms. Corbett incident, correct?

Q.   Yeah, I'm talking about the incident in his office that he describes.

MR. FACCIPONTE:  Objection to form.

LUKE MONNAT - DIRECT EXAMINATION BY MR. WAGNER          14

A.   That --

         THE COURT:   Only one person can speak at a time, so is there an objection?

         MR. FACCIPONTE:   Yeah, objection to form, your Honor. Thank you.

         THE COURT:   Why don't you ask the question -- sustained.  Just ask a clearer question to the witness.

BY MR. WAGNER:

Q.   Are you aware of the meeting that Scott Connell and I had in November of 2024 in his office?

A.   Yes.

Q.   When were you first made aware of that meeting?

A.   I believe it was shortly after it happened.

Q.   Okay.  Was there any written report made?

A.   Negative.

Q.   Okay.  Are you familiar with the workplace violence prevention policy?

A.   Yes.

Q.   Doesn't it specifically state, "aggressive behavior"?

A.   Probably, yes.

         MR. WAGNER:   Can I show it to him?

         THE COURT:   He said he's aware of it.

         MR. WAGNER:   Okay.

         THE COURT:   You can ask him a question.

         MR. WAGNER:   Okay.

LUKE MONNAT - DIRECT EXAMINATION BY MR. WAGNER          15

BY MR. WAGNER:

Q. And are you aware that if there's an act of aggressive behavior, it needs to immediately be documented according to that policy?

A. Yes.

Q. Okay. Did Scott Connell ever provide you written documentation of my alleged aggressive behavior in his office?

A. Negative.

Q. Okay. Isn't it true that -- we're moving into the January incident now.

Did you see me prior to going to Scott and telling him that I was there?

A. Yes.

Q. And you spoke to me, correct?

A. Correct.

Q. Okay. When you -- in your affidavit, you say you looked at the school calendar.

Did the school calendar show that I was supposed to be there?

A. Not your name, no.

Q. What was the name?

A. I don't recall.

Q. Okay. And who's responsible for putting people's information on that school calendar?

A. I'm assuming whoever schedules the event.

Q.   Okay.  So it's not my responsibility, right?

A.   Negative.

MR. FACCIPONTE:  Objection to form.

THE WITNESS:  Oh.

THE COURT:  Overruled.

BY MR. WAGNER:

Q.   When you first saw me at the school in January, was I posing any imminent threat?

A.   No.

Q.   No.

So after Scott Connell had told me to leave, did you escort me off the property?

A.   I asked you to come to my office.

Q.   Okay.  And then after we were in your office and then you gave me the appearance ticket for the trespass, did you escort me to my car from there?

A.   I asked you to leave -- said we were done and you were free to leave.

Q.   Okay.  Did you leave me alone in your office at all?

A.   You weren't under my direct vision all the time, but there was somebody with you all the time.

Q.   Okay.  And were you aware that Scott considered me a security threat prior to talking to him in January?

MR. FACCIPONTE:  Objection to form, your Honor.  And objection to relevancy at this point.

LUKE MONNAT - DIRECT EXAMINATION BY MR. WAGNER          17

THE COURT:  Overruled.

BY MR. WAGNER:

Q.  Are there security cameras?

THE COURT:  I don't think there was an answer.

MR. WAGNER:  Oh, sorry.

BY MR. WAGNER:

Q.  Do you need me to ask again?

A.  Please.

Q.  All right.  Before speaking to Scott in -- on January 13th, were you aware that he considered me a security threat?

A.  Security threat, no.

Q.  And are you the person that would -- should be known that there's a security threat -- if someone potentially could come to the school that's a security threat?

A.  The only information I knew was that you weren't allowed back in the school.

Q.  Okay.  And was that written down anywhere?

A.  Negative.

Q.  No.

Okay.  Are there security cameras that monitor the area outside the cafeteria where the initial interaction in January took place?

A.  Yes.

Q.  Have you reviewed that?

A.  Yes.

LUKE MONNAT - CROSS-EXAMINATION BY MR. FACCIPONTE       18

Q.   Okay.  Did I appear aggressive in that video?

A.   No.

Q.   Okay.  When you and Scott initially came to me, did Scott immediately tell me to leave?

A.   Yes.

Q.   Okay.  So he didn't ask why I was there or anything?

A.   No.

Q.   Okay.

          MR. WAGNER:  That's all.

          THE COURT:  Okay.  Cross-examination?

          MR. FACCIPONTE:  Thank you, your Honor.

CROSS-EXAMINATION BY MR. FACCIPONTE:

Q.   Good morning, Officer.

A.   Good morning.

Q.   You were just asked was the exclusion of Mr. Wagner from district property directed by the superintendent written down anywhere and you answered no.  Do you recall that?

A.   Yes.

Q.   Okay.  When the superintendent directs you that an individual should no longer be permitted on district property, what is your typical next step?

A.   Just keep -- look for that person to come back on property.

Q.   Do you notify any other office within the building that the superintendent has directed such an exclusion, like, say, the registrar's office?

LUKE MONNAT - CROSS-EXAMINATION BY MR. FACCIPONTE      19

A.   The registration office, I did, yes.

Q.   And did you do so in this case?

A.   Yes.

Q.   And would it be incumbent upon them, to your knowledge, to notate that exclusion for their purposes in the registrar?

A.   Yes.

Q.   And then for your purposes, you physically observe the property to enforce the exclusion, if necessary; is that correct?

A.   Correct.

Q.   Okay.  And just, again, for clarity, you did, indeed, specifically go to the registrar after the superintendent told you in November of 2024 and tell them that Wagner was no longer to be permitted on the property?

A.   Correct.

Q.   Thank you.

     So, also, you were asked questions regarding a security threat.  Am I understanding your answer correctly in that at no point in time did the superintendent ever tell you that he considered Mr. Wagner a security threat?

A.   Correct.

Q.   But to your knowledge, does an individual being a security threat have anything to do with enforcing an exclusion and trespass order given by the superintendent?

A.   No.

LUKE MONNAT - CROSS-EXAMINATION BY MR. FACCIPONTE        20

Q.   Thank you.

So, in fact, your knowledge in this situation was that the trespass order had been issued based on the November incident and you were to be enforcing it?

A.   Correct.

Q.   Okay.  Now, let's go to January of 2025 -- actually, first, more basically let me ask you:  Mr. Wagner, do you know how old he is?

A.   Not off the top of my head, no.

Q.   By visual observation, do you estimate him to be a school-aged child?

A.   No.

Q.   Okay.  Was the building in question an elementary school or a high school or a middle school?

A.   I -- I guess I don't understand.

Q.   Was the building that -- the building that you saw Mr. Wagner in in January of '25, what specific building in the district was it, is the question?

A.   Oh, it's the main building.  We only have one building --

Q.   Okay.

A.   -- in the school district.

Q.   By your observation, Mr. Wagner was not anyone who's enrolled in the school, correct?

A.   Correct.

Q.   Okay.  So when you first saw Mr. Wagner in the school, was

your reason for asking him why he was there because you knew he wasn't enrolled in the school?

A.   Correct.

Q.   And was another reason that you knew the superintendent had specifically said that he was an individual that should not be allowed on the property?

A.   Correct.

Q.   Is part of your just general duties as the student resource officer for the school to keep the school safe?

A.   Correct.

Q.   And so from your perspective, there was an individual who's not enrolled in the school and is older than school age, not supposed to be on the property who you see in the hallway in January of '25; is that correct?

A.   Correct.

Q.   Okay.  So when you saw Mr. Wagner in the hallway, am I correct in understanding your prior testimony that you -- you did not accuse him of anything, you rather asked him why he was there?

A.   Correct.

Q.   Okay.  Do you recall what his answer was to you?

A.   He was tabling -- tabling outside the cafeteria for his -- for a nonprofit organization.

Q.   I am very bad with terminology.

Can you please describe to me what you understand tabling

LUKE MONNAT - CROSS-EXAMINATION BY MR. FACCIPONTE        22

to mean?

A.   I understood it as he was setting up a table to discuss with the kids outside the cafeteria what his organization was about.

Q.   Was that table owned or operated by the school in any way?

A.   Yeah, the table is.

Q.   The table itself?

A.   Yes.

Q.   Oh, you mean the table itself was?

A.   He didn't bring a table with him, no.

Q.   Okay.  Thank you.

Are you saying he took one of the school's tables that day?

A.   One was going to be set-up for him.

Q.   Interesting.

My question was, though, more would you describe this tabling the act of setting up and distributing information in the manner he was doing?  Did Mr. Wagner indicate to you that the school had asked him to do that?

A.   Not at that time.

Q.   Thank you.

When you say, "not at that time," are you referring to the fact that at prior points Mr. Wagner might have been allowed on the property to do such a thing?

A.   Correct.

Q.   Okay.  And when you say at that time, do you mean as far as

LUKE MONNAT - CROSS-EXAMINATION BY MR. FACCIPONTE        23

you knew at that point in January of 2025, Mr. Wagner was no longer permitted on the property to do such a thing?

A.   Correct.

Q.   Okay.  Let me ask:  Did -- do you recall the questions asked to you about a calendar by Mr. Wagner just a few moments ago?

A.   Yes.

Q.   Can you describe to me where that calendar would normally be found each day?

A.   Like, my particular calendar was set up on the right-hand side of my e-mail so I know all the events that's taking place at the school.

Q.   So you mean -- you were meaning your work, essentially, e-mail calendar?  Are you stating that that -- the events on that calendar were added by other individuals?  Am I understanding your prior testimony correctly then?

A.   Correct.

Q.   Okay.  That clarifies.  Thank you.

     And let me ask:  What do you recall, if anything, about the calendar entry applied to Youth of Lewis County on the day in question in January of '25?

A.   I don't recall exactly what was written on the calendar, but I know there was some -- something with a youth outside the cafeteria.

Q.   I understand.

LUKE MONNAT - CROSS-EXAMINATION BY MR. FACCIPONTE        24

And I'm not asking you to speculate, but if you know, how would such an event get placed on your work calendar?

A.   Because previously stated, whoever schedules the event puts it on the calendar.

Q.   I guess the question is more, only if you know, who would be scheduling such an event and putting it on the calendar?

A.   The guidance office.

Q.   Thank you.

And would you have any knowledge as to how the guidance officer would get -- office would get the information to put on the calendar?  Via calls from the community or letters or something else?  Only if you know.

A.   I don't know.

Q.   Okay.  Do you recall specifically that Mr. Wagner's name was not on the calendar entry that we're speaking of?

A.   Correct.

Q.   Thank you.

If it had been, what would you have done?

A.   Probably check with Mr. Connell.

Q.   Thank you.

After you spoke to Mr. Wagner as described and asked him what he was doing there -- well, again, can you remind us of his initial answer to you in January of '25?

A.   I'm sorry, could you repeat?

Q.   Could you remind us of your -- Mr. Wagner's initial answer

to you when you saw him in the hallway and asked him what he was doing there in January of '25?

A.   That he was tabling.

Q.   Yes.

What did you do then?

A.   I went down and spoke to Mr. Connell to advise him that Mr. Wagner was at the school.

Q.   Can you describe for us that conversation, if you recall?

A.   I went and asked him if he was aware Mr. Wagner was in the school.  And at that time, he was not.  And I said -- told him that he was tabling outside the cafeteria.  And then Mr. Connell and I walked down the hall to speak with Mr. Wagner.

Q.   Thanks you.

Can you tell us what your purpose was in going to ask Mr. Wagner -- I'm sorry, Mr. Connell if he knew that Wagner was in the school?

A.   At that point, if he was still not allowed to be in the school, he was then trespassing.

Q.   I understand.

So -- well, in fact, you were seeing if any circumstances had changed and perhaps giving Mr. Wagner the benefit of the doubt?

A.   Correct.

Q.   Okay.  And then you confirmed with the superintendent that circumstances had not changed and you did need to enforce the

LUKE MONNAT - CROSS-EXAMINATION BY MR. FACCIPONTE      26

trespass order?

A.   Correct.

Q.   Thank you.

Mr. Wagner asked you if he was aggressive when you first saw him in any way.  You said no.

Did you find anything unusual about his manner or his response about tabling?

A.   After we started speaking with him, he just -- he was very adamant that he wasn't leaving.

Q.   Okay.  Did you ask him to leave voluntarily without having to enforce the trespass order?

A.   Affirmative, yes.

Q.   Can you describe to me or approximate for me how many --

MR. WAGNER:  Objection, your Honor.  There was never any trespass order.

THE COURT:  Sustained.

BY MR. FACCIPONTE:

Q.   Can you -- to back up then, what did you consider Mr. Connell's directive to not allow Mr. Wagner on the property?

A.   The trespass order.

Q.   Thank you.

So based upon that then, same question:  Did you -- what did you -- how many opportunities did you give Mr. Wagner to leave voluntarily before you enforced that directive?

A.   It was several.  Several times.  I would guess about six.

LUKE MONNAT - CROSS-EXAMINATION BY MR. FACCIPONTE        27

Q.   Thank you.

And did Mr. Wagner refuse to leave the school property voluntarily even though he was not a student and he was not permitted to be there?

A.   He asked to be arrested.

Q.   Okay.  How many times approximately did he ask to be arrested?

A.   Twice.

Q.   Okay.  Did he do anything physically to indicate that he really was insistent on being arrested?

A.   He turned around and offered me his hands for handcuffing.

Q.   Did you take that opportunity?

A.   Negative.

Q.   Did -- well, let me ask you this, as well:  In your conversation with Mr. Wagner in your office, I believe, and please correct me if I'm wrong, can you describe to us if Mr. Wagner seemed agitated in any way?

A.   He was very -- like I said, very adamant he wasn't leaving. He was -- the potential of him escalating was definitely there.

Q.   I understand.

What, if anything -- after the tabling comment, what, if anything, did Mr. Wagner say from that point until the point where he left your vision that day that was his reason for refusing to leave when being asked?

A.   It was a public place, he was -- he was invited there by

the guidance office, and he was there for the kids.

Q.   I understand.

Did you ever become aware of any sort of proof in the form of an e-mail, a document, or someone telling you in any way that they invited Mr. Wagner there that day?

A.   No.

Q.   In fact, did I understand your prior testimony correctly that you confirmed, just to be doubly sure with the superintendent before doing anything further, that that had not occurred, correct?

A.   Correct.

Q.   Thank you.

Just to go back to November of 2024 briefly, can you describe to us what conversation, if any, you remember with the superintendent regarding his original directive to you that Mr. Wagner could no longer come on the property?

A.   I just remember Mr. Connell saying there was a discussion in his office between Mr. Wagner and Mr. Connell, and he was disrespectful towards Mr. Connell.  I don't really recall the details, but I do remember him saying he was no longer allowed on the school property.

Q.   I understand.

Are you aware of the district's code of conduct?

A.   Yes.

Q.   Okay.  You're aware that individuals on the district's

LUKE MONNAT - CROSS-EXAMINATION BY MR. FACCIPONTE          29

property have to follow the code of conduct?

A.   Correct.

Q.   Was it your understanding that the superintendent was giving you that directive because violations of the code of conduct had occurred by Mr. Wagner, essentially?

A.   Correct.

Q.   Thank you.

In what you recall -- well, let me back up for a minute.

Do you recall anything at all about what Mr. Wagner said to you during that conversation related to specifics behind his rationale, if anything?

A.   The January incident?

Q.   November, please.

A.   The November incident?

Q.   Yep.

A.   I don't recall.

Q.   Thank you.

So you were never told that it was because Mr. Wagner advocated for children or anything in that respect?  You were just told what you stated?

A.   Correct.

Q.   Thank you.

At any point in time after or before either of these incidents, to be honest, did anyone ever tell you from -- anyone, including the superintendent, ever tell you that actions

LUKE MONNAT - REDIRECT EXAMINATION BY MR. WAGNER          30

took place against Mr. Wagner because of his complaints and you had to enforce a trespass order because of that?

A.    Could you repeat that question?

Q.    Sure, yeah.

Did anyone ever tell you the reason that Mr. Wagner was no longer on the property -- allowed on the property was because he was making complaints to the Board of Education?

A.    No.

Q.    Thank you.  That's all.

MR. FACCIPONTE:  Thank you, your Honor.

THE COURT:  Okay.  Anything further, Mr. Wagner?

MR. WAGNER:  Yeah.

REDIRECT EXAMINATION BY MR. WAGNER:

Q.    Would you say that making complaints to the Board of Education is an acceptable thing to do?

A.    Yes, it's acceptable.

Q.    Okay.  Now, you say you notified the front office, right, of the ban?

A.    Correct.

Q.    Okay.  When did you notify them?  Was this after January or after the November incident?

A.    The November incident.

Q.    Okay.  So was that written down anywhere or was it just a verbal?

A.    Verbal.

LUKE MONNAT - REDIRECT EXAMINATION BY MR. WAGNER      31

Q.   Okay.  So there's nothing that was ever written down saying that I was trespass banned in November, you solely went off of what Scott said?

A.   Correct.

Q.   Was I ever given any paperwork from November saying that I was banned from the property, to your knowledge?

A.   Not to my knowledge.

Q.   Okay.  Do you think it would be important to ensure that person's notified that they're trespass banned from the property?

A.   It's not necessary.

Q.   Okay.  After Scott left your office in January, did I comply with your directives?

A.   Yes.

Q.   When we were down in the cafeteria area while I was saying that I didn't want to leave, did I still comply and pack my things up?

A.   Yes.

Q.   Okay.  So it was more of a verbal that I was -- wasn't wanting to leave, right?  I wasn't physically --

A.   Correct.

Q.   Okay.  And how long do you think the incident from the cafeteria to your office took?

A.   If I were to guess, five minutes.

Q.   Okay.  And I had quite a bit of stuff out on the table,

LUKE MONNAT - REDIRECT EXAMINATION BY MR. WAGNER        32

didn't I?

A.   No, the table was never set-up.

Q.   Well, I had -- there was another table that was there, right?

A.   There is a table set-up there, yes.

Q.   Okay.  We had things that were unpacked on that table?

A.   I don't recall.

Q.   Okay.  Was I breaking any code of conduct prior to Scott telling me to leave?

A.   In November, apparently.

Q.   In January, was I?

A.   No.

Q.   Okay.  And when you went to inform Scott that I was on the school property, did you take me with you?

A.   No.

Q.   Did you have anyone supervise me at all?

A.   No.

Q.   So you let someone who's allegedly trespass banned from the property just be on the school property without any supervision?

         MR. FACCIPONTE:  Objection.  Relevancy.

         THE COURT:  Overruled.

         THE WITNESS:  Correct.

BY MR. WAGNER:

Q.   You said correct?

A.   Correct.

Q.  All right.

MR. WAGNER:  That's all, your Honor.

THE COURT:  Okay.  Anything further?

MR. FACCIPONTE:  Just very briefly.

RECROSS EXAMINATION BY MR. FACCIPONTE:

Q.  Luke -- Officer, you said that, to your knowledge, there was never anything written down regarding Mr. Wagner's trespass. Do you recall that?

A.  Correct, from the November one.

Q.  That you know of, is that correct, in your testimony?

A.  Correct.

Q.  All right.  And, in fact, isn't it true that you have given affidavits previously related to these incidents, correct?

A.  Correct.

Q.  And those affidavits contain written statements of what occurred and -- to your knowledge, correct?

A.  Correct.

Q.  And do you recall ever reviewing affidavits of the superintendent related to this issue?

THE COURT:  Let's move on.  We'll have the superintendent's testimony, so --

MR. FACCIPONTE:  Very good.  Thank you, Judge.  I have nothing further.

THE COURT:  Thank you.  You're excused, Officer.

And, Mr. Wagner, you may call your next witness.

V.W. - DIRECT EXAMINATION BY MR. WAGNER          34

MR. WAGNER:  I'd like to -- for a minor, are we supposed to say their name here or do we need to refer by initials?

THE COURT:  You can provide initials.

MR. WAGNER:  Okay.  V.W.

THE COURT:  Okay.  We will have V.W. say her name for the purposes of swearing her in, but the transcript -- and you may call her by her name or you may just call her V.W., it's probably easier to call her Ms. V.W.  The transcript will only reflect V.W., it won't reflect her name.

THE COURTROOM DEPUTY:  Please state and spell your name for the record.

THE WITNESS:  ███████████████████████████.

THE COURTROOM DEPUTY:  Thank you.  Please raise your right hand.

V.  W., called as a witness and being duly sworn, testifies as follows:

THE COURTROOM DEPUTY:  Thank you.  You can be seated.  And there's cups if you need them.

MR. WAGNER:  Are we ready?

THE COURT:  You may proceed.

DIRECT EXAMINATION BY MR. WAGNER:

Q.  You were at the school January 13th with me, right?

A.  Yes.

Q.  Okay.  We signed in at the front office, correct?

V.W. - DIRECT EXAMINATION BY MR. WAGNER                35

A.   Yes.

        MR. FACCIPONTE:  Objection, your Honor, to foundation for this witness and her -- who she is, her role in the situation, et cetera.

        THE COURT:  Overruled.  You may proceed.

BY MR. WAGNER:

Q.   When Superintendent Connell first approached us down in the cafeteria area, did he tell just me to leave or both of us?

A.   I think it was just you.

Q.   Okay.

A.   No one really talked to me.

Q.   Did Superintendent Connell seem upset?

A.   Yes.

Q.   Okay.  Did he ask why I was there?

A.   If he did, that was not the initial question.

Q.   Okay.  What was the initial question?

A.   I think it was just to leave.

Q.   Okay.  Did I shout or raise my voice prior to the order to leave?

A.   No.

Q.   Okay.  Did Scott Connell raise his voice at all?

A.   I don't think so.

Q.   Okay.  Did you feel threatened by Scott Connell in any way?

A.   No.

Q.   Okay.  Where were the students in regards to where we were?

V.W. - CROSS-EXAMINATION BY MR. FACCIPONTE          36

A.   There were a few students still in the cafeteria, but there were no students where we were.

Q.   Okay.  And did the officer close the doors to where the cafeteria was?

A.   Yes.

Q.   Okay.  And how soon did he close those doors?

A.   Pretty soon.  It was, like, right when they came down.

Q.   Okay.  That's all.

          THE COURT:  Okay.  Cross-examination?

          MR. FACCIPONTE:  Thank you, your Honor.  Just briefly.

CROSS-EXAMINATION BY MR. FACCIPONTE:

Q.   Good morning, ma'am.  Can you state how you know the plaintiff, Mr. Wagner?

A.   Wyatt is my older brother.  And I was there at the school to table with him for his organization.

Q.   Thank you.

     Can you -- are you enrolled in the Copenhagen Central School District?

A.   No.

Q.   Okay.  Where are you enrolled in school?

A.   I'm not enrolled in school.  I home school.

Q.   Thank you.

     Did you call the guidance office on behalf of your brother's youth organization to obtain permission to table that

V.W. - CROSS-EXAMINATION BY MR. FACCIPONTE          37

day?

MR. WAGNER:  Objection, your Honor.  The evidence clearly shows it was an e-mail.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry, can you repeat that?

BY MR. FACCIPONTE:

Q.  Did you call the guidance office?

A.  I did not call the guidance office.

Q.  Okay.  Did -- were you the individual who e-mailed the guidance office and asked for permission to table?

A.  No.

Q.  Okay.  When the organization -- withdrawn.

Let me ask it this way:  What is the Youth of Lewis County?

A.  What is it?

Q.  Yes.

A.  It's an organization to let youth hang out with each other.

Q.  Okay.

A.  Just have fun.

Q.  Okay.  So what are the general age ranges of the kids, perhaps you can tell us, enrolled in the program?

A.  13 to 17, I think.

Q.  Okay.  And who started this organization?

A.  Wyatt.

Q.  Okay.  And how old is your brother?

A.  21.

SCOTT CONNELL - DIRECT EXAMINATION BY MR. WAGNER          38

Q.   Thank you.

Is -- withdrawn.  That's all the questions.  Thank you so much.

THE COURT:  Anything further, Mr. Wagner?

MR. WAGNER:  No, that's all.

THE COURT:  Okay.  You're excused.  Thank you.

And, Mr. Wagner, you may call your next witness.

MR. WAGNER:  I'll call Scott Connell.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  Please state and spell your name for the record.

THE WITNESS:  Scott Connell, S-C-O-T-T, C-O-N-N-E-L-L.

THE COURTROOM DEPUTY:  Thank you.

S C O T T   C O N N E L L, called as a witness and being duly sworn, testifies as follows:

THE COURTROOM DEPUTY:  Thank you.  You can be seated.  And there's cups of water if you need them.

THE WITNESS:  Thank you.

THE COURT:  You may proceed.

DIRECT EXAMINATION BY MR. WAGNER:

Q.   Mr. Connell, in November 2024, you received an e-mail from me; is that correct?

A.   I believe so.

Q.   Okay.

A.   I receive a lot.

Q.   It was also sent to the entire Board of Education, correct?

A.   I believe so.

Q.   Okay.  And what was that e-mail stating happened?

A.   That you were removed from our district unfairly.

Q.   Can you say that again?

A.   I -- I don't recall exactly everything that was in the e-mail, but there was a letter, I believe, also --

Q.   The November e-mail?

A.   -- to the board.

     Yeah, I -- yes.

Q.   The concerns about the teacher?

A.   Yes.

          MR. FACCIPONTE:  Objection to form, your Honor.

          THE COURT:  Overruled.

BY MR. WAGNER:

Q.   Did you contact my supervisor regarding the specific e-mail in November prior to our meeting in your office?

A.   My recollection, I spoke to your supervisor about the written letter that I saw, not necessarily the e-mail, but it could have been.

Q.   What written letter are you talking about?

A.   Maybe I printed it off my printer.  I don't know.  It was a letter written to the Board of Education and that's when I contacted Stephanie at Cornell.

SCOTT CONNELL - DIRECT EXAMINATION BY MR. WAGNER          40

Q.   Okay.  Were you upset that I included the school board in that e-mail?

A.   No.

Q.   Okay.  In your affidavit, you state that you found the teacher's actions to be proper under the circumstances.  Was that determination based on specific district policy or was it your personal opinion?

A.   I was a physical education teacher for 27 years and did exactly what she did many times.

Q.   But you -- would you agree that rules change over time?

A.   Yes.

Q.   And how long have you not directly been a physical education teacher?

A.   About 17 years.

Q.   Okay.  So a lot could have changed from there?

A.   I -- yes, I guess.

Q.   Was there a specific policy that outlines that a teacher is allowed to use physical exercise as a punishment?

          MR. FACCIPONTE:  Objection, your Honor. Mischaracterizing facts in the record.

          THE COURT:  Sustained.

BY MR. WAGNER:

Q.   Are you familiar with the aversive intervention New York State law for schools?

A.   I am not.

Q.  And I'll read this real quick.  It says, "adversive intervention means an intervention that is intended to induce pain or discomfort."

Is having -- does forcing students to walk as a punishment cause discomfort for them?

A.  No.

MR. FACCIPONTE:  Objection, your Honor, to relevancy and mischaracterizing facts in evidence at this point.

THE COURT:  I'll allow -- overruled.  I'll allow a little examination on this issue.

BY MR. WAGNER:

Q.  Okay.  Aversive invention mentions movement limitations used as a punishment.  Can't that also mean forcing students to walk?

A.  I would disagree.

Q.  Okay.  It also states, "other stimuli or actions similar to the interventions described in this paragraph," so -- one second.

In your affidavits, you state that I claim that the students were being abused in a form, correct?

A.  Correct.

Q.  Okay.  Did you fill out your -- you have to fill forms out for the Department of Education every year, correct?

MR. FACCIPONTE:  Objection to form, your Honor.

THE COURT:  Overruled.

SCOTT CONNELL - DIRECT EXAMINATION BY MR. WAGNER      42

THE WITNESS:  Do I fill out a lot of forms?  Yes.

BY MR. WAGNER:

Q.   Okay.  And in this section of the law, it specifically states that any substantiated or unsubstantiated claims of this aversive intervention or corporal punishment must be reported to the Department of Education.

In your 2024/2025 filings, did you report the unsubstantiated claim?

A.   I did not.  I didn't feel that walking in the gym --

Q.   But it was unsubstantiated, correct?

THE COURT:  You need to let the witness finish.  He said he, "didn't feel that walking in the gym" -- and you need to let him finish that answer.

BY MR. WAGNER:

Q.   Okay.

A.   I didn't feel like that was undue punishment.

Q.   Okay.  It was unsubstantiated, correct?

A.   Why would -- no.

THE COURT:  Let's move on.

MR. WAGNER:  Okay.

THE WITNESS:  I'm confused with the question, your Honor.

THE COURT:  Yes, I understand.  Let's move on. You've answered it.

BY MR. WAGNER:

SCOTT CONNELL - DIRECT EXAMINATION BY MR. WAGNER    43

Q.   How would you describe my behavior in your office in November?

A.   Inappropriate, very aggressive, loud.

Q.   So you agree that it was aggressive?

A.   Yes.

Q.   Okay.  And are you familiar with your own school's policy that specifically states that aggressive behavior must be immediately documented?

A.   Yes.

Q.   Okay.  Did you immediately document that?

A.   I did not.

Q.   Okay.  Why?

A.   At the time, I wanted to call Stephanie.  And I did not document it.  I'm busy in what I do.  I was in the middle of doing something when you stormed in my office and I moved on to my next event.

Q.   So you violated your own policy?

A.   Essentially.

Q.   Okay.  And regarding the alleged verbal trespass ban that you gave me, what specifically did you say to me?

A.   That -- when you came in my office?

Q.   Yes.

A.   I asked you to leave.

Q.   So you asked me to leave.  Did you tell me that I was banned from the property?

SCOTT CONNELL - DIRECT EXAMINATION BY MR. WAGNER          44

A.   I did not.

Q.   So you admit that you did not ever tell me that I was trespass banned from the property?

A.   Correct, at that point.

Q.   When did I ever find out that I was trespass banned?

A.   In the -- during the January incident when --

Q.   But -- I'm sorry.  In multiple affidavits, you state that I was informed I was trespass banned prior.

A.   Okay.

Q.   Okay.  Did you ever hold a hearing after the January incident with the school board regarding the trespass ban?

A.   I informed them of it.

Q.   So it was entirely your own decision?

A.   Correct.

Q.   Okay.  Did the school board agree or disagree?

A.   I don't believe they -- no, they listened and I informed them.

Q.   Okay.  In January when you first approached me, do you recall telling me to -- that I was asking -- my apologies.

     Do you recall asking why I was there?

A.   Officer Monnat, I believe, told me on the way down.

Q.   Okay.  In your affidavit, you say that you asked me why I was there.

A.   I may have.  Again, this was quite a while ago.

Q.   Okay.  So after -- in regards to the November incident,

SCOTT CONNELL - DIRECT EXAMINATION BY MR. WAGNER        45

after I left your office, did -- what did I do?  Did I go off school property?

A.  I do not know.

Q.  Okay.  So you just left this person you described as aggressive unsupervised to go throughout the school?

A.  As I mentioned before, I was in the middle of doing something.

Q.  So your stuff that you were doing was more important than ensuring that this aggressive person was being handled?

MR. FACCIPONTE:  Objection, your Honor.  Relevancy and asked and answered at this point.

THE COURT:  Overruled.

THE WITNESS:  Again, yes.

BY MR. WAGNER:

Q.  So you let someone that was allegedly aggressive just leave your office and go throughout the school because your paperwork or whatever you were doing was more important?

A.  I didn't feel like you were going to harm anyone.

Q.  Okay.  But in your affidavits you claim that I'm a substantial threat to the safety of the school.  Is that still your belief?

A.  I believe the -- the way you were behaving at that time and coming and being loud in my office, we could have had a conversation, so I wasn't fearful for the safety of our students.

SCOTT CONNELL - DIRECT EXAMINATION BY MR. WAGNER      46

Q.   Okay.  So what was the reason for the ban in January?

A.   I didn't want you in our building.

Q.   Is that your personal opinion that you don't want me there?

A.   Yes.

Q.   And you never -- never mind.  I already asked that.

Did you ever take my key card from me after I left your office in November?

A.   I did not.  I don't know if my secretary did.

Q.   Okay.  So you let, again, someone that was aggressive leave the school with a --

A.   Yes.

Q.   -- key card?

A.   Yes.

Q.   Okay.  And are those key cards able to be remotely deactivated?

A.   Yes.

Q.   Okay.  Did anyone deactivate it?

A.   Again, you were not -- you were Cornell's employee, not ours, so --

Q.   But you guys handle the key cards, correct?

A.   We give them to Cornell to pass out.

Q.   Okay.  Can Cornell deactivate them?

A.   They --

MR. FACCIPONTE:  Objection, your Honor.  Asking for speculation.

THE COURT:  Overruled.

THE WITNESS:  My initial answer was Cornell -- Wyatt was not our employee, so we give the cards to Cornell and they pass them out to their employees.

BY MR. WAGNER:

Q.   And can Cornell --

A.   They cannot.

Q.   Okay.  So once again, you let someone that was aggressive --

A.   Yes.

Q.   -- leave your office, go throughout the school unsupervised, and leave the school without -- I mean, with a key card that would give them access?

MR. FACCIPONTE:  I must reiterate my objection. Asked and answered, your Honor.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MR. WAGNER:

Q.   Okay.  And are you familiar with your district's policies outlining anti-retaliation and whistleblowing?

A.   Correct.

Q.   Do you believe that you retaliated against me?

A.   No.

Q.   Okay.  Is there any -- you said there's no documentation. Is there video footage of me acting allegedly aggressive in

November?

A.   Not in my office.

Q.   Is there any witnesses other than yourself?

A.   My secretary.

Q.   And are they here today?

A.   They are not.

Q.   Okay.  Did they ever write an affidavit?

A.   I do not know the answer to that.

Q.   Okay.  So they witnessed this?

A.   Yes.

Q.   Did they witness it or did they hear it?

A.   Hear it.  Well, the angle of his desk, he would have -- probably would have seen you and possibly not me --

Q.   Okay.

A.   -- based on where I sit and he sits.

Q.   Okay.  All right.  Were you aware that the guidance office invited me to be on the school property in January?

A.   I didn't -- I was not.

Q.   Okay.  In your sworn -- one of your sworn statements, you stated that when you approached me, I immediately took a defensive stance and began to smirk, and then at that point you asked me to leave the building.  Do you remember that?

A.   I believe when I came down the stairs, I asked you to leave the building and then we --

Q.   What was the reason you were asking me to leave?

A.   The reason I asked you to leave is I thought when your employment with Cornell was over that I wouldn't see you anymore, so I didn't put another thought to it.  You had left Cornell, you had left our building, I thought that was going to be the end --

Q.   So you --

A.   -- of our relationship.

Q.   So you just assumed that as soon -- as someone who worked within the school, they're never going to come back to the school?

A.   Again, you didn't work for us, you worked for Cornell.

Q.   I said within the school.

A.   I assumed once your employment with Cornell was over that I wouldn't see you in the school.  I didn't know that you had started a youth organization in Lowville.

Q.   Do you still believe that this trespass ban should be upheld?

          MR. FACCIPONTE:  Objection to relevancy, your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  Do I believe, yes.

BY MR. WAGNER:

Q.   And why is that?

A.   The way that you behaved in my office was concerning.

Q.   But there's no evidence of that, right?

A.   I -- it's what I saw and what I felt.

Q.   Okay.  And you -- have you reviewed the video footage from January?

A.   Yes.

Q.   Okay.  And are you willing to present it to this Court?

THE COURT:  I have the video footage.  It's part of the record.

MR. WAGNER:  Okay.  That's all my questions then.

THE COURT:  Okay.  Cross-examination?

MR. FACCIPONTE:  Thank you, your Honor.

CROSS-EXAMINATION BY MR. FACCIPONTE:

Q.   Superintendent, first and foremost, in November of 2024 when you told Mr. Wagner to leave, clarify please for us, was he employed by the district in any capacity?

A.   He was not.

Q.   Okay.  He was, to your understanding, because I think you just said, employed wholly by someone else?

A.   Correct.

Q.   Okay.  And to your understanding, Superintendent, was Officer Monnat's testimony correct that Mr. Wagner is not a student, nor is he clearly not school-aged?

A.   Correct.

Q.   Okay.  And in your position as superintendent, do you consider it imperative to control the access of individuals to your school building?

A.   Correct.

Q.   Is that for the safety and wellbeing of the students and the staff?

A.   Correct.

Q.   Okay.  Particularly in modern times, isn't it true that there are a variety of procedures and regulations that apply to controlling access to public school districts such as yours?

A.   Correct.

Q.   Okay.  Isn't it true that it is important for you as superintendent to have personal knowledge of the people, the groups, who will be accessing the building that have the children under your charge in it?

A.   Correct.

Q.   Okay.  And so in November of '24, can you clarify for us what you told Mr. Wagner in the -- first of all, tell me what exact words do you remember telling Mr. Wagner when you were indicating to him that he needed to leave and not come back in November of '24?

         THE COURT:  Counsel, can we just walk through what happened, how Mr. Connell first became involved in November of 2024 and what happened?

         MR. FACCIPONTE:  Absolutely, Judge, we can.

BY MR. FACCIPONTE:

Q.   Let's go back there, Scott.

     Please essentially take it from the top with me.  Tell me, when did you first learn of any sort of incident, problem,

complaint, et cetera, regarding Mr. Wagner in November of '24?

A.   When he entered my office.

Q.   Thank you.

So prior to that time, you had not received any sort of notice from the gym teacher or Mr. Wagner's employer of anything, correct?

A.   Correct.

Q.   Okay.  Now, you indicate in your prior testimony that you were working on something.  Can you describe a little more what exactly you recall when you first became aware of this issue as Mr. Wagner entered your office?

A.   I was sitting at my desk.  I don't know if he connected with my secretary or not or walked directly in.  Generally, when somebody comes, they stop there, my secretary will say to me so and so would like to see you.  He walked in, sat down, and explained to me how inappropriate the teacher was in what she did.  And I believe I asked him, you know, what happened.  And I asked him what happened when you went to the teacher.  And he informed that he didn't ever speak with the teacher, that the fourth graders told him what happened.

And I was, I guess, trying to be a teacher at that point and said to him, you know, they're fourth graders, they're going to probably tell you whatever they need to tell you to not be in trouble.  And I was, kind of, trying to educate him in what you should have done was gone to the teacher.  And his response to

me was I'm here to advocate for kids, that's what I do, and they were mistreated.

Q.   I understand.

Can you tell me when he -- you said he sat down in a chair, I would assume, across from your desk?

A.   I have two chairs in front of my desk, correct.

Q.   Did he introduce himself when he sat down or did you already know Mr. Wagner?

A.   I don't recall if I knew him or not and if he introduced himself.  He came in and he started the conversation.

Q.   Well --

A.   I was a little taken aback.  Like I said, I was working and all of sudden I was engaged in this conversation about what was going on.  And I was just asking him -- I was trying to educate myself about what happened.

Q.   Did you have any sort of preexisting workplace relationship or friendly relationship with Mr. Wagner that would have made you expect that he would come into your office and sit down and start talking to you about an issue like this?

A.   No.

Q.   Okay.  So is it true then that your first involvement in this issue is -- it sounds sudden because it is sudden?

A.   Absolutely.

Q.   I understand.

When you had the conversation with Mr. Wagner that you just

SCOTT CONNELL - CROSS-EXAMINATION BY MR. FACCIPONTE      54

described, and I want you to hold there for a minute, can you tell us what you personally observed about his manner and his tone and the way he was speaking to you?

A.   Like I said, I was just kind of taken aback.  I was -- he walked in unannounced.  And when I asked him if he had spoken to the teacher and he said no, as a former teacher, fourth graders, again, do whatever they can do to get out of trouble.  And that was -- he was taking their word on what happened.

Q.   Now, can you please tell us, kind of, what happened from there once you gave him that advice in the conversation?

A.   He continued to tell me that he was an advocate for children and that's what he was going to do, he will always advocate for children, and that they were mistreated.

Q.   I understand.

Did you just simply respond to that statement alone with get out and don't come back, or what occurred?  What led you to that?

A.   To -- my recollection is our conversation ended and he left.

Q.   Okay.  And when -- so when your -- you had your conversation with him in November of '24, what about that conversation made you tell him at the end that he needed to leave?

THE COURT:  Counsel, he didn't say that he told him at the end.  Can you just walk through what happened so I have a

SCOTT CONNELL - CROSS-EXAMINATION BY MR. FACCIPONTE        55

sense of what happened?

MR. FACCIPONTE:  Yes.

BY MR. FACCIPONTE:

Q.   Please tell us.

A.   So after our interaction happened -- Stephanie is the supervisor of Cornell, so I called Stephanie and said to her, you know, I'm not interested in him being here, can you -- they are in many schools in our area.  I said, can we -- I think I used the word trade -- can we trade him for another school, I just don't want him in our building, I don't want somebody that's going to come in and, you know, be loud and verbal like that, can we trade him.  And she said, yes, and --

Q.   Thank you.

A.   -- at that point I thought it was the end of it for us, that he would be going to another district.

Q.   Okay.  Stephanie, can you tell us her last name?

A.   Capone.

Q.   And can you tell us where was she employed?

A.   Cornell Cooperative Extension.

Q.   To your understanding, that was Mr. Wagner's employer?

A.   Correct.

Q.   Okay.  Did you speak to anyone else besides Stephanie with Mr. Wagner's employer?

A.   I don't believe so.  I might have spoken with John, the immediate person at the school, but I'm not sure if I spoke with

him or not.  I know that I called Stephanie for certain.

Q.  Do you recall when you called Stephanie?

A.  Shortly after the incident.

Q.  That same day?

A.  I don't recall.

Q.  Okay.

A.  I believe so, though.

Q.  Do you recall if you had already received either the e-mail or the letter that you were referring to in your testimony previously from Mr. Wagner when you called Stephanie?

A.  I had not seen a letter at that point.

Q.  Thank you.

Now, I'm going to hand you what has been previously marked for identification as Defendants's 1.

MR. FACCIPONTE:  May I approach, your Honor?

THE COURT:  You may.

BY MR. FACCIPONTE:

Q.  Here you go, Superintendent.  Please take a look at that briefly.  Take the time you need to tell me if you recognize it.

A.  I do recognize this, yes.  It's what we use with our outside agencies.

Q.  Now, is this a -- particularly though, can you -- is it true that the top heading is -- it's indicating it's a memorandum of understanding between your school district and Cornell Cooperative Extension of Jefferson County, the then

SCOTT CONNELL - CROSS-EXAMINATION BY MR. FACCIPONTE          57

employer of Mr. Wagner?

A.   Correct.

Q.   Is it your understanding that the terms you just looked over in this memorandum of understanding were in effect at the time of the November '24 and the January '25 incidents?

A.   Correct.

Q.   Thank you.

I'm going to draw your attention to term three in joint responsibilities here on the first page.

Can you briefly take a look at that and tell me what that term means to you as far as what you did for your obligations for the district to have to effectuate?

A.   So being a small school, we've been connected with Cornell quite some time.  We talk often about things that go on with the program and how things are going.

Q.   I understand.

So essentially, keeping each other updated on everything that's occurring in the interaction between the two groups?

A.   I wouldn't say everything.  I mean, they've been with us a long time.  Things that are out of the ordinary, for sure.

Q.   Okay.  Disciplinary incident with students or student injuries would qualify, maybe?

A.   Definitely.

Q.   Okay.  Issues with staff or complaints about staff would qualify?

A.   Correct.

Q.   Okay.  Complaints by staff, would that qualify?

A.   Correct.

Q.   Thank you.

Did you have a particular individual who you normally spoke with at Cornell to effectuate this term of the contract -- memorandum?

A.   Stephanie.

Q.   Thank you.

And how many times, can you tell us, did you speak with Stephanie about Mr. Wagner?

A.   The initial I recall, and there were probably many after that with back and forth when I would see her, but I don't recall ever making another -- that was the initial -- my request was to, you know, trade him.

Q.   Thank you.

So the only contact about Mr. Wagner specifically that you recall, that's my question, was the initial contact?

A.   Correct.

Q.   Thank you.

And that occurred at a time, to your memory, before you were even in receipt of anything from Mr. Wagner to the board?

A.   Correct.

Q.   Thank you.

So when you -- can you tell me what you recall about your

SCOTT CONNELL - CROSS-EXAMINATION BY MR. FACCIPONTE     59

conversation with Stephanie about the November '24 incident and an update as per this term?

A.   I mean, I just shared with her, again, my concern that he never spoke with the teacher, he spoke only with the children, and that -- to me, that didn't make a lot of sense --

Q.   I understand.

A.   -- and coming into my office in the manner that he did.

Q.   I understand.

You made a statement that you thought that would be the end of it.  Did -- when you -- can you tell us what you mean by that?

A.   So I thought once Cornell moved him to another place that I wouldn't -- he wouldn't be in our building anymore.

Q.   You say moved him.  Am I understanding that you never asked that he be terminated or disciplined or anything like that?

A.   Correct, I used the term traded, I believe, to another site and we would get someone from that site to fill his position.

Q.   I understand.

So you were also -- you also did continue your relationship with Cornell --

A.   Correct.

Q.   -- thereafter?

I understand.

Did you ever hear anything further from Cornell themselves about Mr. Wagner after that?

A.   I did not.

Q.   Thank you.

So -- but it was your understanding upon the time that you hung up the phone with that initial call that you would not be seeing Mr. Wagner anymore from Cornell?

A.   Correct.

Q.   Thank you.

So when you -- between January when you saw Mr. Wagner and that call, did you hear anything about Mr. Wagner during the time that would have made you understand he began a youth organization called Youth of Lewis County?

A.   No.

Q.   Did you hear anything about Mr. Wagner during that time that would have made you understand that he would be permitted to be in your school for some reason other than Cornell Cooperative Extension that he used to be employed with?

A.   I did not.

Q.   Okay.  When you saw -- actually, withdrawn.

Let me ask this:  Have you ever become aware of anything to suggest that guidance from your district invited Mr. Wagner to the building?

A.   No.

Q.   Okay.  Does your guidance office typically invite independent youth groups like that to table?

A.   I would say not invite, but --

Q.   Thank you.

A.   -- allow.

Q.   Understood.

After you saw Mr. Wagner in January, did you issue him any sort of letter or notice regarding what had occurred?

A.   I do not recall.

Q.   Okay.  Well, I'm not asking you who or what was stated between you and any potential counsel, but did you work with counsel on any issues with Mr. Wagner between November and January 15th?

A.   No.

Q.   Okay.  So when -- towards the end of January, it is not your recollection that Mr. Wagner was sent a letter of any type by your district?

A.   Could you ask that again?

Q.   Sure.

Do you remember your district sending a letter to Mr. Wagner on January 15th of 2025 after the January 13th incident?

A.   We could have.  I don't know.

Q.   I understand.

And if you did, would you have provided him your understanding of what occurred and notice of what occurred?

A.   Yes.

Q.   Thank you.

When you spoke with your school resource officer after the

November '24 incident, do you recall at all that conversation with him?

A.   I recall speaking with him, I don't -- the -- most of it I do not, just that -- what had happened.

Q.   I understand.

Well, you heard his testimony here today --

THE COURT:  We're not going to ask the witness about another witness's testimony.

MR. FACCIPONTE:  Understood.

BY MR. FACCIPONTE:

Q.   Superintendent, did you ever tell Cornell that Mr. Wagner needs to be terminated from his employment or else their relationship with you would be in jeopardy in any way?

A.   Never.

Q.   Okay.  Superintendent, I think that's all the questions I have.  Thank you very much.

THE COURT:  Okay.  Did you tell the school officer -- resource officer, Officer Monnat, that Mr. Wagner was not permitted on the school campus?

THE WITNESS:  Correct.

THE COURT:  And why did you do that?

THE WITNESS:  I -- after the incident in my office, I was not interested in having him in our building.

THE COURT:  And what about the incident made you concerned about having him in the building?

PROCEEDINGS                                    63

THE WITNESS:  I guess, having somebody come in unannounced and be, again, very loud, again, concerned that he hadn't even approached the teacher to ask what went on in the gym, the fact that he, you know, many times said I'm here to advocate for kids, this is what I do.  And I just found it odd that he hadn't gone through the proper channels of speaking to the teacher first, I guess, was my concern.

THE COURT:  And at some point did you learn that he had sent an e-mail to the school board?

THE WITNESS:  I did see that, yes.

THE COURT:  And what happened -- do you recall when you learned that?

THE WITNESS:  I do not.

THE COURT:  Okay.  And what happened in January?

THE WITNESS:  So Officer Monnat came to my office and said, you know, I remember -- I recall you saying that Mr. Wagner was not invited in our building.  And I said, what's he doing?  He goes, he's down by the cafeteria.  So we walked down the stairs, I saw Mr. Wagner, and I said, you need to leave.

THE COURT:  And then what happened?

THE WITNESS:  He kept -- I think he -- I believe he said you're not the boss.  And I think Mr. Monnat said, well, he kind of is the boss, and had just verbal exchanges of -- with Officer Monnat and myself at that time.  I don't recall exactly what was said, but basically you can't remove me from your

school.  And I said, yes, I can.

THE COURT:  And then everyone went to the resource officer's office?

THE WITNESS:  Correct, Officer Monnat.  He was being loud upon -- Officer Monnat closed the doors because there were children in the cafeteria.  And he at that point, as Mr. Monnat's testimony, did turn around and put his hands behind his back and said you're going to have to arrest to make me leave.  And Officer Monnat said, I'm not going to handcuff you, let's go up to my office.

THE COURT:  Thank you.

THE WITNESS:  Mm-hmm.

THE COURT:  Anything further, Mr. Wagner?

MR. WAGNER:  I don't think so.

THE COURT:  Okay.  You're excused, Mr. Connell.

THE WITNESS:  Thank you.

THE COURT:  Any other witnesses, Mr. Wagner?

MR. WAGNER:  Other than myself, no.

THE COURT:  Okay.  You may testify.

MR. WAGNER:  Okay.  How do I do that?

THE COURT:  It would be helpful to the Court for you to briefly describe what you believe happened in November with Mr. Connell and then January.

MR. WAGNER:  Okay.

THE COURT:  And you can come up and be a witness.

WYATT WAGNER - DIRECT EXAMINATION BY MR. WAGNER        65

THE COURTROOM DEPUTY:  Please state and spell your name for the record.

THE WITNESS:  Wyatt Wagner, W-Y-A-T-T, W-A-G-N-E-R.

THE COURTROOM DEPUTY:  Thank you.  Please raise your right hand.

W Y A T T   W A G N E R, called as a witness and being duly sworn, testifies as follows:

THE COURTROOM DEPUTY:  Thank you.  You may be seated. And cups are here if you need water.

THE COURT:  And why don't you describe what happened when you went to Mr. Connell's office in November.

DIRECT EXAMINATION BY MR. WAGNER:

THE WITNESS:  When I went to Scott Connell's office in November, I went in there and I said, I'm here as an advocate and that as a member of the community -- because I live in the district.  I didn't say I was here as a Cornell employee.  And then he proceeded to yell at me for including the school board in the e-mail.  And I was a little taken aback by that because it's been a -- kind of a common practice throughout my life, something my mother did, as well, wherever there was issues at school, just for accountability, to include the school board when things aren't going the way they should from the beginning.

And then after our conversation, I left him, went back to the 4H office.  And then my supervisor, John, came and talked to me and then just said to go home while we figure this

WYATT WAGNER - DIRECT EXAMINATION BY MR. WAGNER      66

stuff out.

THE COURT:  Okay.

THE WITNESS:  That's all.

THE COURT:  And then what happened with Cornell?

THE WITNESS:  Cornell, it was either an e-mail or a call, they asked me to meet with them in Watertown in their office.  I went there, I met with them, they wanted to transfer me to Beaver River School, which is, like, a far drive because I lived in Copenhagen and I could not make that drive, as my girlfriend at the time and I were sharing a car.  And I also had a job immediately after Cornell's job in Lowville that I had to go to.

I said I'm not going to take this, I think we should talk to the school board and figure out what is going on.  And then I believe it was the executive director who told me I'm just trying to get people in trouble.  And I said, no, I'm not.

After that, I just left the office, I wasn't going to deal with it.  I already had contacted my other employer and asked if I could just go full-time there after everything that happened and she said yes.

Then they called me in for another meeting to discuss everything again and asked me to sign resignation papers and I refused to resign myself because I really felt like this should have been something that was resolved through the school and discussed with the school and not just listen to what the school

WYATT WAGNER - CROSS-EXAMINATION BY MR. FACCIPONTE        67

wants.

THE COURT:  Okay.  Anything else you'd like to say about the November incident with Mr. Connell?

THE WITNESS:  I will say that I'm not sure who contacted Cornell, but my supervisor, John, did speak to me prior to me going to Scott's office about the e-mail that I sent.

THE COURT:  Okay.  And then in January, is there anything -- I have seen the video.  Is there anything you want to add about January?

THE WITNESS:  I just -- I was never told I couldn't be on school property.  I had no reason to believe I couldn't be there.  That's all.

THE COURT:  Okay.  And anything else that you'd like to add about January?

THE WITNESS:  I would just say that my -- me refusing to leave, I complied with where they wanted me to go, but it was more of a form of civil disobedience because there was no legitimate reason.  I kept asking for a reason.

THE COURT:  Okay.  Cross-examination?

MR. FACCIPONTE:  Thank you, your Honor.

CROSS-EXAMINATION BY MR. FACCIPONTE:

Q.  Mr. Wagner, regarding your e-mail -- first, please tell us, when did you send an e-mail regarding the November '24 problem you say you observed in gym to the school board?

WYATT WAGNER - CROSS-EXAMINATION BY MR. FACCIPONTE          68

A.   I sent it after I tried to report it to my direct supervisor and he didn't do anything.  And we -- also, that day, my class was required to go around to the other classrooms and pick up the milk to put in the fridge.  And I brought the student that I trusted the most regarding what happened in the gym with me and then we happened to have seen Scott in the hallway and I pretty much -- I didn't speak to him, the student explained the situation, I did not explain what actually happened.

After that, the principal came down and talked to the students.  It was -- after the principal came and talked to the students, that is when I contacted the school board through e-mail.

Q.   I understand.

Can you describe to me, though, when in relation to you entering the superintendent's office in November of '24 that was?  A matter of hours, days, what?

A.   I believe that I had sent the e-mail on a Thursday and we had a holiday Friday and I had not received an answer on Monday, I believe it was.  And when I came in, my supervisor, John, spoke to me about the e-mail.  And then when I was on my 15-minute break, I went and -- to Scott's office.  And I also requested to speak to him through his secretary.

Q.   But just you -- the supervisor spoke to you about the e-mail or about the situation underlying in the gym class?

A.   The e-mail.

Q.   Can you then tell me what you claim your supervisor said to you about this e-mail?

A.   That it was wrong that I sent the e-mail.

Q.   He did?  Can you tell me why -- who said it was wrong to send the e-mail again?

A.   John, my supervisor.

Q.   Okay.  He does not work for the district?

A.   No.

Q.   Okay.  You are claiming that he told you it was wrong of you to send an e-mail to the school board for the school district, not something to do with them?

A.   Can you rephrase that?

Q.   Yes.

     Can you please tell me what you're saying John said it was wrong to do, specifically?  That's the question.

A.   To send that e-mail and include the school board in it.

Q.   Okay.

A.   He never received the e-mail.

Q.   Okay.  So the question now is:  Did John say anything in this conversation you're alleging to indicate why he was telling you it was wrong to e-mail the school board?

A.   Because he was not in the know of the e-mail.

Q.   Okay.

A.   They weren't able to handle it how they wanted.

WYATT WAGNER - CROSS-EXAMINATION BY MR. FACCIPONTE    70

Q.    Oh, I understand.

Was he indicating to you he had a chain of command concern?

A.    Not to my knowledge.

Q.    Okay.  He was telling you it was wrong to send the e-mail, though, because he didn't know about it and they couldn't handle it the way they wanted?  Am I understanding your testimony correctly?

A.    Yes.

Q.    Okay.

A.    Can I specify?

Q.    Please.

A.    The reason I didn't include him in that e-mail was because I had already brought it to him and he shrugged it off.

Q.    Okay.  So once again, though, this was -- your belief, this was a Monday after the gym equipment situation happened on a Friday?

A.    No.

Q.    Okay.  Let's go back to the original question then.

A.    I believe the gym equipment happened on a Wednesday.

Q.    So back to the original question, please, sir.  I want to know when you believe you sent the e-mail to the school board in relation to walking into Superintendent Connell's office in November.  That's all.

A.    I'm not understanding your question.  Like, how long of a time?

WYATT WAGNER - CROSS-EXAMINATION BY MR. FACCIPONTE        71

Q.   That's the question still, yep.

A.   Okay.  I sent the e-mail on Thursday and I went to his office on Monday.

Q.   Okay.  Thank you.

So you were essentially still very concerned on Monday about the issue that you had already sent an e-mail on on Friday?

A.   I was concerned that there was no e-mail back.

Q.   I understand.

You wanted a response directly to that e-mail by Monday, correct?

A.   Not by Monday, but I would like to understand that it was being looked into.

Q.   Okay.  So what did you do on Monday then?

A.   Like, I already answered that.

Q.   Can you tell me again?  Remind me.

A.   I went -- I got to work and then John spoke to me, and then after our conversation, I went on my 15-minute break and I went to Scott's office and asked to speak to him.

Q.   Thank you.

So you asked to speak with Scott.  Who did you ask that question to?

A.   The secretary.  It wasn't a man, it was a girl.  I don't know her name.

Q.   Okay.  Did they grant you permission?

Case: 25-2212, 01/28/2026, DktEntry: 54.1, Page 224 of 271

WYATT WAGNER - CROSS-EXAMINATION BY MR. FACCIPONTE       72

A.   I believe so.  There was no, "no."  If there was a no, I wouldn't have gone in.

Q.   Did they say go right in, sit on down?

A.   I'm not going to speculate on what exactly they said.

Q.   Did you go into the superintendent's office and introduce yourself or anything to that effect?

A.   Yes --

Q.   Okay.

A.   -- after I was, from my knowledge, granted permission.

Q.   Okay.  And when you introduced -- well, tell me, prior to introducing yourself, did you have any sort of working or friendly relationship with the superintendent?

A.   I met him a few times.

Q.   Okay.  After introducing yourself, what do you recall saying to the superintendent?

A.   I recall saying that I am not coming here as a Cornell employee, I am coming here as an advocate and a member of the community and I'm concerned about this.

Q.   I understand.

So you specifically admitted to the superintendent, like, first thing when you sat down, that you were not there in your capacity as somebody who was working for Cornell Cooperative Extension and, therefore, licensed to be there?

A.   No, but --

Q.   Okay.

HANNAH F. CAVANAUGH, RPR, CRR, CSR, NYACR, NYRCR
AA-475
(315) 234-8545

A.   -- I was on my 15-minute break and I -- also, the e-mail I used was specifically not the Cornell e-mail, as well, to ensure that it was not fully directed from Cornell.

Q.   Okay.  So after you clarified for the superintendent that you were not there in your capacity as an employee who works with their affiliated -- the group they have this memorandum of understanding with, what did you tell him about anything?  What did you want from him?

A.   I was just concerned that the issue was not being resolved or looked into at all.

Q.   The question is:  What was your goal in going to his office?

A.   To begin a conversation on how we can resolve this issue.

Q.   I'm sorry, so you -- was the goal simply the conversation itself then?

A.   No, the end goal is to resolve the issue with the teacher.

Q.   That's the question I'm asking you, sir.  What was your goal?  What did you want him to do?

A.   Resolve the issue.

Q.   How would you like him to -- how did you want him to resolve the issue?

A.   Look into the incident.  I said this multiple times.

Q.   What made you believe that that was not occurring or going to occur?

A.   What?

Q.   What made you believe that the incident was not looked into or going to be looked into?  You just described to us you sent the e-mail on Thursday, it's now Monday, and you're sitting down in the superintendent's office.  I'm just asking why?

A.   After I told him why I was there, he informed me that the students had lied, and that he reviewed the video footage.

Q.   My question is still that I want -- I just want to know, what did you want him to do to the teacher on this Monday following your e-mail on a Thursday that you believe had not been done?  That's all.

A.   Whatever the school thought was the appropriate actions.

Q.   Okay.  And what -- as a follow-up to that, what caused you to be so concerned during the period between Thursday and Monday that that was not occurring or going to occur, that you needed to, as you just said, not an employee of Cornell, in your own capacity, go in and talk to the superintendent?

A.   I'm going to object because I answered this question multiple times.

Q.   No, that --

          THE COURT:  Overruled.  You need to answer the question.

BY MR. FACCIPONTE:

Q.   Yeah.

A.   Repeat it.

Q.   Sure.

WYATT WAGNER - CROSS-EXAMINATION BY MR. FACCIPONTE     75

What occurred between Thursday and Monday that made you think that this district was not going to look into your complaint, was going to treat it not seriously, was going to do all the things that you just said, so, therefore, you had to go into the superintendent, as you admit, as a personal citizen and not an employee of Cornell even?

A.   Because my Cornell supervisor reprimanded me for sending an e-mail and there was never any response that, hey, this will be looked into.

Q.   So it was a personal grievance, not a public one?

A.   It's a public concern.

Q.   I'm asking your reason --

THE COURT:  Sustained.

MR. FACCIPONTE:  Withdrawn at this point.  Thank you.

THE COURT:  Okay.  Anything further?

MR. FACCIPONTE:  Yes.  Thank you, your Honor.

BY MR. FACCIPONTE:

Q.   When you finish your conversation with the superintendent that day, what did he tell you, if anything, before you left?

A.   He was upset about including the school board in the e-mail.

Q.   My question is:  What words do you recall him saying, to the best of your recollection --

A.   That it was unprofessional --

Q.   -- before you left?

A.   It was unprofessional that I included the school board in the e-mail.

Q.   Okay.  Did he tell you anything about your ability to come back to the property or not?

A.   No.

Q.   Okay.  Did he tell you that he was not expecting to see you again or anything to that effect?

A.   No.

Q.   Okay.  All right.  I understand.

What is -- when did you start the Youth of Lewis County organization?

A.   March 1, 2024.

Q.   Okay.

A.   I'll specify --

Q.   Are you the only individual over the age of 18 associated with that group?

A.   No.

Q.   Okay.  Under what circumstances did you tell the school district that you personally, not the Youth of Lewis County, would be coming on their property in January of '25, if any?

A.   In my e-mails, I believe they specifically say, "can I."

Q.   Okay.  And you believe it was your understanding that you were specifically informing the district that I, Wyatt Wagner, would be coming on their property?

A.   Yes.

WYATT WAGNER - CROSS-EXAMINATION BY MR. FACCIPONTE        77

Q.   Okay.  Did you receive a letter from the district after the January 13th incident?

A.   Yes.

Q.   Okay.  Actually, let me back up just one second.

In the January 13th incident, isn't it true that you were asked to leave and refused?

A.   As a form of civil disobedience, yes.

Q.   Okay.  Isn't it true that that occurred multiple times?

A.   Yes.

Q.   Isn't it true that before each continued refusal, you fully heard and understood the prior demand that you leave the property?

A.   I would have left if I was given a reason.

Q.   Okay.  But you did hear the direction and you did refuse, right?

A.   Yes --

Q.   Okay.

A.   -- as a form of civil disobedience.

Q.   And you did that after receiving at least one warning, correct?

A.   Yes.

Q.   Okay.  Now, when you received a letter from the district in January of '25, did -- was it your understanding that that was sent because of your letter to the board or because of the January 13th incident?

A.   Both.  In his trespass ban, he mentions both the November incident and the January incident.

Q.   The November incident being -- I'm sorry, please clarify for me.

A.   Where he states that I was aggressive in his office.

Q.   Okay.  The question was, though, to your understanding was the letter to the board referenced anywhere?

A.   I believe so.

Q.   Okay.  Understood.

In any event, after the January incident, is it your allegation that the district contacted Cornell and caused you to be effected in any sort of way?

A.   After the January incident?

Q.   Yes.

A.   No.

Q.   Okay.

A.   I wasn't working for Cornell anymore.

Q.   And that was the next question.

By the January incident, isn't it true that you were no longer working for Cornell, correct?

A.   Yes.

Q.   All right.  And by the January incident, isn't it true that the only youth group that you were affiliated in any way was your own?

A.   No.

Q.   Okay.  Tell me the other ones.

THE COURT:  Okay.  I think we don't need this at this point.

MR. FACCIPONTE:  Understood, your Honor.

THE COURT:  Anything further?

MR. FACCIPONTE:  Just briefly -- well, nothing further at this time.  Thank you, your Honor.

THE COURT:  Okay.  Anything further, Mr. Wagner?

MR. WAGNER:  I don't think so.

THE COURT:  Okay.  You're excused.

And any additional witnesses?

MR. WAGNER:  I don't have any.

THE COURT:  Okay.  And we will need to take a short break.  And I do only have until 1:00 for this hearing today.

Does the defense expect to call witnesses?  And we'll take a short break before those witnesses.

MR. FACCIPONTE:  Yes, your Honor.

THE COURT:  A ten-minute break, that's all.

MR. FACCIPONTE:  Yes, we will.  And we will keep very mindful of your Honor's schedule, but, yes, we will call a witness or two.  Thank you, Judge.

THE COURT:  Okay.  So let's take a very short ten-minute break.  We'll be back at 11:55 a.m. for the defense witnesses.

THE COURTROOM DEPUTY:  Court is in recess.

PROCEEDINGS                                    80

(Court in recess.  Time noted:  11:47 a.m. to 11:57 a.m.)

THE COURT:  The defense may call their first witness.

MR. FACCIPONTE:  Thank you very much, your Honor. The first witness that we will call is Ms. Stephanie Graf.

MR. WAGNER:  Your Honor, can I just point out that I never received this witness list until just now when I asked him for it?

MR. FACCIPONTE:  Your Honor, we provided both an e-filed copy and a paper copy by mail whenever the filing date is on here, 8/20.

THE COURT:  Okay.  Did you not receive this in the mail?

MR. WAGNER:  No, I checked the mail.  I sent an e-mail to them on Monday saying I had not received anything.

THE COURT:  Did you get the e-mail saying he hadn't received a witness list?

MR. FACCIPONTE:  Frankly, your Honor, I'm not entirely sure on that.  I can say I personally did not and probably would not have received that by Monday given that it's Wednesday, but someone from my office would have let me know if it was not sent or, I honestly don't know, responded to.  I'd imagine it was in some form or fashion, but I don't want to say one way or another as I'm standing here now, you know.

THE COURT:  Okay.  At this point we'll just continue.

STEPHANIE GRAF - DIRECT EXAMINATION BY MR. FACCIPONTE    81

You now have the witness list.

MR. WAGNER:  Yeah, I just wanted to inform you.

THE COURT:  I'm sorry?

MR. WAGNER:  I just wanted to inform you of that, your Honor.

THE COURT:  Okay.  You may call Stephanie Graf.

MR. FACCIPONTE:  Thank you, your Honor.

THE COURTROOM DEPUTY:  You can come here.  Please state and spell your name for the record.

THE WITNESS:  Stephanie Graf, S-T-E-P-H-A-N-I-E, G-R-A-F.

THE COURTROOM DEPUTY:  Please raise your right hand.

S T E P H A N I E   G R A F, called as a witness and being duly sworn, testifies as follows:

THE COURTROOM DEPUTY:  You can be seated in the witness stand.  And there's cups if you need them.

DIRECT EXAMINATION BY MR. FACCIPONTE:

Q.  Good morning, Stephanie.

A.  Good morning.

Q.  Can you please tell us who is your currently employer?

A.  Excuse me?  I didn't hear you.

Q.  Can you please tell us who is your current employer?

A.  Cornell Cooperative Extension of Jefferson County.

Q.  Thank you very much.

Was that your same employer in both the years '24 and '25?

STEPHANIE GRAF - DIRECT EXAMINATION BY MR. FACCIPONTE     82

A.   Yes.

Q.   Okay.  What is your position there?

A.   I'm the deputy executive director.

Q.   Thank you.

Is one of your duties working with local school districts who use your services?

A.   Yes.

Q.   Okay.  Is Copenhagen one of those districts?

A.   Yes.

Q.   Okay.  If you know, approximately how long have you -- has your organization had a relationship with the district?

A.   We've had a relationship with the district for 19 years.

Q.   Thank you.

I am going to hand you what has been previously identified as Defendants's Exhibit 1, but not entered into evidence. Please briefly take a look at it and let me know when you're complete.  I'm just asking you if you recognize it.

A.   I wrote this document, so I recognize it.

Q.   Understood.  Very good.

And just briefly, what is it?

A.   It's a collaboration agreement between Cornell Cooperative Extension and Copenhagen Central School District.

Q.   Thank you.

Was this document that I just handed you, and the terms on it, what was in effect as a memorandum of understanding between

STEPHANIE GRAF - DIRECT EXAMINATION BY MR. FACCIPONTE     83

your group and the district in '24 and '25?

A.   Yes.

Q.   Thank you.

        MR. FACCIPONTE:  At this point, your Honor, I would like to enter that document into evidence.

        THE COURT:  Okay.  Any objection?

        MR. WAGNER:  No.

        THE COURT:  Okay.  It's -- Exhibit 1 is admitted.

        MR. FACCIPONTE:  Thank you.

BY MR. FACCIPONTE:

Q.   And, Stephanie, please draw your attention to term three on the first complete section of the page there.  And I believe there's a highlight on it.

     Can you describe to us, as the individual who wrote the term, what that is intended to do between the groups signing?

A.   Can you repeat that?

Q.   Sure.

     What is that term for between the two groups?

A.   Number three?

Q.   Yes.

A.   Basically, under joint responsibilities between Cornell and Copenhagen Central School District, the intent behind this is that if there's any unusual circumstances related to a program, related to students, related to staffing, that we would communicate that with one another.

Q.   Thank you.

Can you describe to us historically from your perspective how that term has worked in operation between the two groups? For example, phone calls, formal letters, what?

A.   Generally, it's worked with phone calls.

Q.   Thank you.

A.   And --

Q.   Please go ahead.

A.   Oh, I thought you'd asked me for, like, an example.

Q.   Yes.  Yeah, and you can feel free to please provide an example.

A.   Okay.  So, say, for instance, a child or -- it's the 4H after school program, a child got hurt on the program, maybe they broke their arm or something after school.  Most of the school people are no longer at the school.  I would pick up the phone, I would call the superintendent and let him know that Bobby or Joe or, you know, whoever it was, broke their arm at the after-school program, and this is what we did as a result of that.  Just -- it's just things like that.

Q.   Thank you.

THE COURT:  And let's turn to what's relevant here.

MR. FACCIPONTE:  Yep.

THE COURT:  Let's move to the facts.

BY MR. FACCIPONTE:

Q.   And that also includes employee complaints against the

district, correct?

A.   Yeah, if there's anything with programming, staffing, yes.

Q.   Thank you.

     Did you receive any sort of notification pursuant to this term from the superintendent in or around November of '24 or January of '25?

A.   I received a phone call from the superintendent.

Q.   Thank you.

     Do you recall whenabouts that occurred?

A.   I would say it -- it occurred either probably the -- probably the 7th or 8th of November.

Q.   Thank you.

     Can you please tell me, to your best recollection, what was discussed in that call?

A.   That -- in that particular call, the superintendent told me that -- I can't remember if he said it was a letter or an e-mail had been written to him and to the school board members from Wyatt.

Q.   Thank you.

     And was it your understanding that he was making that call to notify you of that complaint pursuant to this term?

A.   Yes.

Q.   Thank you.

     And do you -- and you -- as you testified as an example, had you received similar calls from the superintendent in the

STEPHANIE GRAF - DIRECT EXAMINATION BY MR. FACCIPONTE     86

past on issues like this?

A.   Yes.

Q.   Thank you.

Was there anything else that was said to you during that call that gave you any sort of pause that made you think that there was something inappropriate going on?

A.   No.

Q.   Thank you.

Did there come any other time where you had any other discussions with the superintendent about Mr. Wagner?

A.   Yes.

Q.   Okay.  Can you describe that for us?

A.   There was a second phone call.  And that probably was -- I can't remember exactly, but it was the beginning of the next week, so that was either probably Monday or Tuesday.  And what I remember from that phone call is that Scott said that Wyatt was no longer allowed in the school building.

Q.   I understand.

And I'm not going to ask you reasons, et cetera.  Just generally, it's true that Mr. Wagner is no longer employed with your organization; is that correct?

A.   That's correct.

Q.   And isn't it true that, though -- for whatever reason he's no longer employed, there was no -- it was not due to any interaction or any relevancy with the school district, correct?

MR. WAGNER:  I would object to that.

THE COURT:  Sustained.

MR. FACCIPONTE:  Withdrawn.  I will -- I can rephrase.

THE COURT:  Okay.

BY MR. FACCIPONTE:

Q.  To your knowledge, Mr. Wagner's separation from Cornell was not directed by the school district, correct?

A.  No.

Q.  Thank you.

MR. FACCIPONTE:  That's all the questions I have, your Honor.

THE COURT:  Okay.  Cross-examination?

MR. WAGNER:  All right.

CROSS-EXAMINATION BY MR. WAGNER:

Q.  So Scott told you he didn't want me at the school anymore, correct?

A.  He said you are no longer allowed in the school building.

Q.  Did you feel the need to investigate the issue at all?

MR. FACCIPONTE:  Objection to relevancy, your Honor.

THE COURT:  Sustained.

BY MR. WAGNER:

Q.  The Defendants's Exhibit 1 specifically states to discuss. Did you discuss the issue or did you just do as he told you to?

MR. FACCIPONTE:  Again, objection to relevancy and

mischaracterizes testimony.

THE COURT:  Overruled.

THE WITNESS:  Can you ask that again?

BY MR. WAGNER:

Q.  So in Defendants's Exhibit 1, the paragraph we read, the section three, it specifically states to discuss all issues.

Did you discuss the issue or did you only do what Scott told you to do?

A.  We discussed it.

Q.  And what was in that discussion?

A.  The e-mail/letter that was written to Scott and the school board was forwarded to me.

Q.  Okay.  Did you discuss -- you said there was two phone calls, correct?

A.  Yes, I -- I'm talking about the first one, yes.

Q.  Okay.  And what about the second phone call, did you discuss that one?

A.  Not really.  I would have to say not really.

Q.  So you believed him purely based off of the e-mail that he didn't want me in the school -- let me rephrase.

You didn't find any reason to investigate what he was claiming about me?

MR. FACCIPONTE:  Objection to relevancy.

THE COURT:  Sustained.

BY MR. WAGNER:

Q.   The second phone call you made, what was discussed in that?

A.   The second phone call that Scott made to me, he said that you were no longer allowed in the school building.

Q.   Okay.  Did he describe what happened?

A.   I don't recall.

Q.   So you just went along with what he said?

A.   I don't recall the -- like, the specifics what --

Q.   Okay.

A.   So -- yeah.

Q.   Based on this memorandum of understanding that you wrote, when I initially reported my concerns to John, should he have investigated it?

THE COURT:  Sustained.

MR. WAGNER:  Okay.  No further questions.

THE COURT:  Okay.  Let me ask you, what do you recall from the first phone call that you got from Mr. Connell?

THE WITNESS:  What I remember from the first phone call is that he -- that Scott called me and he said that he had received a letter/e-mail and also the school board was listed in it.  And I remember him asking me if I was aware of some misuse of equipment during the 4H after-school program, you know, from the gym.  And I said that had not been brought to my attention, I wasn't aware of it.  And he said he would forward me that letter/e-mail and I said okay.  And that was about it.

THE COURT:  Okay.  And did he forward you the letter

STEPHANIE GRAF - CROSS-EXAMINATION BY MR. WAGNER        90

or e-mail?

THE WITNESS:  Yes, I received that on the 8th of November.

THE COURT:  And then the phone call the next week, do you recall him saying anything other than that Mr. Wagner was no longer allowed in the building?

THE WITNESS:  I mean, I don't -- I mean, I feel like I'm paraphrasing because I don't remember it exactly, but I do -- I do remember him saying that he had had another conversation or he had had -- no, excuse me, let me -- I do -- that he had a conversation with Wyatt and Wyatt was no longer allowed in the school building.  He did not get into the specifics of the conversation.

THE COURT:  Thank you.

THE WITNESS:  That's --

THE COURT:  Anything further?

MR. FACCIPONTE:  Nothing, Judge.  Thank you.

MR. WAGNER:  Nothing.

THE COURT:  Okay.  Thank you, Ms. Graf.  You're excused.

THE WITNESS:  Do I return -- (indicating)

THE COURT:  You can return that to defense counsel.

And defense may call their next witness.

MR. FACCIPONTE:  Thank you, your Honor.  We will briefly call John Kunz.

JOHN KUNZ - DIRECT EXAMINATION BY MR. FACCIPONTE        91

THE COURTROOM DEPUTY:  Good afternoon.  Please state and spell your name for the record.

THE WITNESS:  John, J-O-H-N, Kunz, K-U-N-Z.

THE COURTROOM DEPUTY:  Thank you.  Please raise your right hand.

J O H N   K U N Z, called as a witness and being duly sworn, testifies as follows:

THE COURTROOM DEPUTY:  Thank you.  You can be seated in the witness stand.  And there's cups and water if you need them.

DIRECT EXAMINATION BY MR. FACCIPONTE:

Q.   Hello, sir.  Very briefly, can you please tell us where you're currently employed?

A.   I'm sorry?

Q.   Can you please tell us where you're currently employed?

A.   I'm employed with Cornell Cooperative Extension of Jefferson County.

Q.   Thank you.

Were you employed there in '24 and '25?

A.   Yes, sir.

Q.   What is your position there?

A.   I'm a program manager.

Q.   Where were your duties located in '24 and '25?

A.   Beaver River, Carthage, and Copenhagen.

Q.   Thank you.

JOHN KUNZ - DIRECT EXAMINATION BY MR. FACCIPONTE        92

Do you know Mr. Wagner?

A.   I do.

Q.   How did you come to know him?

A.   He was my educator at the Copenhagen School.

Q.   Thank you.

Do you recall any incidents occurring with Mr. Wagner at the school in November of 2024?

A.   Yes.

Q.   Can you please describe for us what you recall?

A.   There was an incident with some gym equipment being misused.

Q.   Thank you.

How did that incident come to your attention?

A.   That incident was brought to my attention by principal Pam Ratliff.

Q.   Thank you.

Did -- what did you do with that information once it was brought to you?

A.   I attempted to rectify it.  I wanted to rectify it with the school.

Q.   And can you just briefly tell us what you did to do that?

A.   Well, on one of these particular days when I found out about it, I asked Wyatt to stay in the library while I went to make things right with the school.  I was going to go to Pam's office.  I was going to go to Scott's.  When I got back to Pam's

JOHN KUNZ - DIRECT EXAMINATION BY MR. FACCIPONTE          93

office, Wyatt was no longer in the library.

Q.   Okay.  Did you tell him to stay in the library?

A.   I asked him to stay in the library.

Q.   Did you tell him what you were going to do while he stayed in the library?

A.   I believe my words were, "I'm going to go fix this."

Q.   Just briefly, can you explain to us why you felt you needed to go fix this?

A.   The school was unhappy with what we had done.

Q.   I understand.

Did you have any conversation with Mr. Wagner about him making a written complaint to the Board of Education?

A.   I did not have that information.

Q.   I understand.

Did you have any conversation with Mr. Wagner before you came back and he was gone from the library about what occurred in the underlying gym incident?

A.   Only that -- not very specific.  There was some equipment that was not --

Q.   Thank you.

A.   -- put back where it should have been.

Q.   After you came back to the library and Mr. Wagner was not where you told him to stay, what occurred then, to your knowledge?

A.   Well, he had a discussion with Mr. Connell and that was the

JOHN KUNZ - CROSS-EXAMINATION BY MR. WAGNER          94

end of the story.

Q.   Can you please tell me -- you -- how did you even become aware of that discussion?

A.   After the fact.

Q.   Thank you.  I have no further questions for you, sir. Thank you.

THE COURT:  Cross-examination?

MR. WAGNER:  Yep.

CROSS-EXAMINATION BY MR. WAGNER:

Q.   Were you aware of the e-mail and our meeting in the library?

A.   No, I was not.

Q.   Okay.  Do you recall the -- me coming to you and reporting the concerns the students had?

A.   I do.

Q.   And what did you do afterwards?

A.   I did not address them directly.  I was going to go through the staff and make sure we corrected the situation.

Q.   Did you do that?

A.   I really didn't get the chance to do that.

Q.   Okay.  Who called you after the incident with Scott in his office that I had?

A.   I cannot recall.

Q.   Okay.  Did you discuss with Scott what happened after the incident?

A.   Not really, no.

Q.   No?  Okay.

          MR. WAGNER:  That's all.

          THE COURT:  Okay.  You're excused, Mr. Kunz.

          THE WITNESS:  Thank you.

          THE COURT:  And defense may call the next witness.

          MR. FACCIPONTE:  Thank you very much, your Honor.
Again, just briefly, Ms. Amanda Root, please.

          THE COURTROOM DEPUTY:  Good afternoon.  Please state
and spell your name for the record.

          THE WITNESS:  Amanda Root, A-M-A-N-D-A, R-O-O-T.

          THE COURTROOM DEPUTY:  Thank you.  Please raise your
right hand.

          A M A N D A   R O O T, called as a witness and being
duly sworn, testifies as follows:

          THE COURTROOM DEPUTY:  Thank you.  You can be seated
in the witness stand.  And there's cups of water here if you
need them.

          THE WITNESS:  Okay.

DIRECT EXAMINATION BY MR. FACCIPONTE:

Q.   Good afternoon, Ms. Root.

     Can you please tell us where you're currently employed?

A.   Cornell Cooperative Extension of Jefferson County.

Q.   Were you employed at that same employer in '24 and '25?

A.   Yes.

AMANDA ROOT - DIRECT EXAMINATION BY MR. FACCIPONTE          96

Q.   When you were employed in '25, did you ever have -- come to have a conversation with Mr. Wagner?

A.   I had a conversation with Mr. Wagner in '24 --

Q.   Okay.

A.   -- not in '25.

Q.   Can you please describe to us the conversation you had with him in '24?

A.   Yes.  So after all of the incidents that have been discussed came to my attention -- I'm the executive director of Cooperative Extension.  I asked Mr. Wagner if he could come in and talk to me about those incidents.  And we were doing a write-up about them because -- for two reasons.  One, he had violated our complaint procedure as our employee.  So if he had concerns about the -- what was going on in the after-school program, working up our chain of command, as he was our employee as opposed to going through the school district and to the Board of Education, so we -- we wanted to discuss that.

     And so we discussed what our complaint procedure was and why that was in place and what would happen, you know, and in the future, if you could please follow that complaint procedure and then we can look into incidents, because I had not been made aware of anything.

     And then the second piece of information that we discussed was that it had come to my attention that Copenhagen Central School indicated that he was no longer welcome in their

building, and as such, he couldn't be an educator there.  So we were going -- we -- he was still going to stay employed with us, but that we needed to explore other options for other after-school educator positions we had available throughout the county.  And there were several choices.

Q.   Let me pause you right there.

A.   Yeah.

Q.   Can you tell me, first and foremost, who was present for -- well, let me just ask this, actually:  It was you personally present with Mr. Wagner speaking and telling him these things?

A.   Yes.

Q.   Okay.  Good.

And can you tell me -- you said that occurred in '24. Whenabouts in '24 did that occur?

A.   I believe it was November 14th.

Q.   Oh, okay.  So this occurred, to your understanding, within a few weeks after the initial November e-mail to the board that has been discussed?

A.   Yes.

Q.   Okay.

A.   The e-mail is November 7th, to my recollection, and then this conversation occurred a week later.

Q.   And in any event, well before January of '25, right?

A.   Yes.

Q.   Okay.  And do you think you were unclear at all -- there

was any ambiguity or there could have been any ambiguity in what you said to Mr. Wagner about the district not wanting him back?

A.   No, it was written.  There was a written document that was also provided to Mr. Wagner.

Q.   That document was not provided by the district, right?

A.   No, it was provided by me.

Q.   I understand.  Thank you.

And I'm not asking for your agency's particular rationales for anything, but I'm only asking:  Did the district ask you to even have that conversation that you just described?

A.   No.

Q.   Okay.

A.   The --

Q.   Is that something you did of your own accord as part of your job duties?

A.   Yes.

Q.   Okay.  Because you saw a problem with what had occurred?

A.   Yes.

Q.   And Mr. Wagner?

A.   Yes --

Q.   Okay.

A.   -- and we wanted to clarify our expectations going forward.

Q.   I understand.

Was it -- was it impactful for you that the district superintendent did not want him back at all in your

decisionmaking to have that conversation?

A.   Well, it was part of the conversation because we needed to discuss where his assignment would be going forward.

Q.   I understand.

Now, again, I'm not asking for any rationales or motivations, but please just tell me, did the district ask, request, or have any input into whatever circumstance may have caused Mr. Wagner's separation from employment with Cornell?

A.   That was Mr. Wagner's choice to separate from employment. We did not terminate his employment. We offered other employment options and they were -- he did not want those other employment options, so he left the meeting and didn't come back to work, so we deemed that to be job abandonment and --

Q.   I understand.

A.   Yeah.

Q.   Just, though, for clarity purposes, the district did not send you any communications to that -- during that process requesting that this be done, give you any direction --

A.   No.

Q.   -- that that be done?

No input at all from the district or the superintendent, correct?

A.   Correct.

Q.   Okay.  Thank you.

MR. FACCIPONTE:  That's all the questions I have.

THE COURT:  Any cross-examination?

MR. WAGNER:  Yeah.

CROSS-EXAMINATION BY MR. WAGNER:

Q.  Did -- who did you hear from initially that I was not to go back to the school?

A.  The communication came, I believe, through Stephanie to me. I never spoke with Scott.  Scott spoke with Stephanie. Stephanie spoke with me.

Q.  Okay.  Do you guys have an anti-retaliation policy at Cornell?

MR. FACCIPONTE:  Objection, your Honor.  Relevancy to Cornell's --

THE COURT:  Sustained.  Sustained.

MR. FACCIPONTE:  Okay.

BY MR. WAGNER:

Q.  Were you aware when you were trying to have me change locations for work that I was incapable of making those --

A.  I was not aware.

MR. FACCIPONTE:  Objection to relevancy, your Honor.

THE COURT:  Sustained. Sustained.

BY MR. WAGNER:

Q.  Did you ever investigate Scott's claims?

A.  Yes.

MR. FACCIPONTE:  And objection to relevancy on this one, too.  I'm sorry, your Honor.

THE COURT:  Sustained.

MR. WAGNER:  That's all.

THE COURT:  Okay.  You're excused, Ms. Root.  Thank you.

Any other witnesses from the defense?

MR. FACCIPONTE:  Nothing further, Judge.  We rest.  Thank you.

THE COURT:  Okay.  In this case, the plaintiff, for the emergency relief that he's seeking, he's seeking a rescission of the trespass notice that was issued on January 15, 2025.  He's asking the Court to prohibit the defendants from interfering with his access to Copenhagen Central School District for his nonprofit work or other lawful activities, and he's asking the Court to prohibit the defendants from further acts of retaliation or discrimination.

And I'll talk about the causes of action and -- in this case.  The first cause of action is a First Amendment retaliation claim.  To allege a First Amendment retaliation claim, a plaintiff must assert that he has a right protected by the First Amendment, that the defendants's actions were motivated or substantially caused by plaintiff's exercise of that right, and that the defendants's actions caused him some injury.  And to show a causal connection, the plaintiff has to introduce evidence sufficient to warrant the inference that the protected speech was a substantial motivating factor in the

PROCEEDINGS                102

adverse action.

And I'm citing to the case -- the Second Circuit case of *Dorsett v. The County of Nassau*, 732 F.3d 157 at 160, a case from 2013, and an Eastern District of New York case from 2011, *Frisenda v. Incorporated Village of Malverne*, M-A-L-V-E-R-N-E, at 775 F. Supp. 2d 486 at 511.

I do find that the plaintiff has failed to meet his burden of establishing a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation on this claim with respect to his request to rescind the trespass notice. I find that Mr. Wagner failed to establish that this no trespass letter was motivated or substantially caused by the plaintiff's exercise of his First Amendment right.

I do credit Mr. Connell's testimony that he was concerned in the November 2024 meeting about the fact that Mr. Wagner was loud and that Mr. Wagner had never spoken with the teacher before coming in to the superintendent's office in the manner that he did. And I do credit his testimony that Mr. Wagner, when he was there in January, challenged Mr. Connell's authority to ask him to leave, saying you're not the boss, and that at that time he was being loud and said that the school would have to have him arrested. And I think it's undisputed here that the -- Mr. Connell asked him to leave -- Mr. Connell or the school resource officer asked Mr. Wagner to leave and he

PROCEEDINGS                                    103

refused to leave multiple times.

So given -- on this record with respect to the no trespass letter, I do find that Mr. Wagner has failed to establish that it was motivated or substantially caused by his exercise of his First Amendment right, that is his complaint about how the students were treated.

With respect to his due process claim, to state a violation of procedural due process under the Fourteenth Amendment, a plaintiff must plead facts establishing, one, the existence of a property or liberty interest of which he was deprived and, two, the deprivation of that interest with insufficient process.

With respect to this claim, Mr. Wagner has failed to show likelihood of success on the merits of establishing a property or liberty interest. Access to school grounds is not a protected liberty or a property interest. And I'm relying on the case of *Jones v. Bay Shore Union Free School District*, 947 F. Supp. 2d 270 at 279, an Eastern District of New York case from 2013.

So I do find that he's failed to establish a likelihood of success on the merits of the due process claim.

And, finally, with respect to the equal protection claim, Mr. Wagner has alleged an equal protection claim under a class of one theory, arguing that he -- his sister was present and similarly situated but treated differently.

PROCEEDINGS                                          104

I don't find that his sister's an adequate comparator because she did not behave in the same manner as Mr. Wagner did with a raised voice, refusing to leave, and asking to be arrested. Her affidavit says she stood back as the situation unfolded and that is what is depicted on the video.

I also find that Mr. Wagner's failed to establish irreparable harm because he fails to demonstrate a likelihood of success on the merits of his constitutional claims. He cannot establish irreparable harm through the violation of a constitutional right. And that's the *Walden v. Kosinski* case, 2025 WL 2413251 at 14, a Second Circuit case from 2025.

To establish irreparable harm, the moving party must show an injury that is actual and imminent and cannot be remedied by an award of monetary damages. The no trespass letter was issued on January 15th. This lawsuit was filed four months later. At the time this lawsuit was -- lawsuit and request for emergency relief was filed, the injury was not imminent and I don't find that it was irreparable. I note that the trespass letter allows Mr. Wagner to make a written request to go on school property.

With respect to my factual findings, I do note that these are provisional in the sense that they're not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses.

With respect to the -- Mr. Wagner's request for an

PROCEEDINGS                                            105

injunction directing the defendants from further acts of retaliation or discrimination, I also note that that is what's been referred to as an obey the law injunction, which does not pass muster under Rule 65(d) of the Federal Rules of Civil Procedure because injunctions must be specific in terms and describe in reasonable detail the acts sought to be restrained, and an injunction directing a defendant to obey the law is not acceptable under that rule.  And that's the *Kaganovich v. McDonough* case, 547 F. Supp. 3d 248 at 278, from the Eastern District of New York, 2021.

So for those reasons, I do deny the plaintiff's motion for emergency injunctive relief, that's Docket No. 5.

And I know there are other motions pending and the Court will decide those motions in due course.

Anything further at this time?

MR. WAGNER:  When we specify the school district property, are we talking about the outside or the inside of the school?

THE COURT:  And I'm not sure what your question is when you say, "when we specify."

MR. WAGNER:  Well, just in general, because -- my main concern is just Copenhagen's a small town.  I don't have access to any public areas other than the school.  I'd like to be able go and watch tennis games and stuff.  I'm more than willing to comply with asking for permission before I go in for

PROCEEDINGS                    106

my youth stuff.

THE COURT:  And that would be a question -- I'm looking at the trespass -- the no trespass letter.  It says the district is banning you from all school property, so that would be an issue that you would need to work out with Mr. Connell.

MR. WAGNER:  Okay.  Thank you, your Honor.

THE COURT:  Anything further at this time?

MR. FACCIPONTE:  Nothing from defendants.  Thank you, your Honor.

THE COURT:  Okay.  Thank you.

THE COURTROOM DEPUTY:  Court is adjourned.

(Time noted:  12:33 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, HANNAH F. CAVANAUGH, RPR, CRR, CSR, NYACR, NYRCR, Official U.S. Court Reporter, in and for the United States District Court for the Northern District of New York, DO HEREBY CERTIFY that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 19th day of November, 2025.

s/ Hannah F. Cavanaugh_____

HANNAH F. CAVANAUGH, RPR, CRR, CSR, NYACR, NYRCR

Official U.S. Court Reporter