# Exhibit R



**COUNTY ATTORNEY OFFICE**

**Joan E. McNichol**
*County Attorney*
joanmcnichol@lewiscounty.ny.gov

**Matthew A. Goettel**
*Assistant County Attorney*
mattgoettel@lewiscounty.ny.gov

P: 315-376-5282
F: 315-376-3857

March 7, 2025

Mr. Wyatt Wagner
9502 State Rt 12, Apt 2
Copenhagen, NY 13626

Re:  LC Board of Legislators
     Removal Hearing Transcript – March 4, 2025

Dear Mr. Wagner:

Enclosed please find a copy of the recorded transcript from the hearing before the Lewis County Board of Legislators held on March 4, 2025 at 4:00 p.m.

Thank you for your attention.

Sincerely,

Joan E. McNichol

Enc.
JEMhs

Lewis County is an equal opportunity provider and employer. Complaints of discrimination should be made known to the Lewis County Board of Legislators.

Mobile Recording - Mar 4
Tue, Mar 4, 2025

0:00 - Joan McNichol (hereinafter "JM")
Before we get formally started, Mr.

0:00 - Conference Room (JM) - Speaker 1
Chairman, this is Wyatt Wagner, the chairman of the board. And our legislators who are here, we're missing two. One is out sick and another legislator may be able to get on. And here, here anyway. Everybody who we thought would be here, do we even have anybody else here? So, we're just gonna check and see if he's gonna get on.

0:51 - Lawrence Dolhof (hereinafter "LD")
Yeah, you go ahead and start. Okay, we'll start the hearing.

1:21 - Conference Room (LD) - Speaker 4
The board has convened this hearing, consulted the mental health and mental hygiene law section 41411 to determine whether or not Wyatt Wagner, an appointed member of the Community Services Board, should be removed by this appointed body. Present, there are eight members of the board of legislators. Legislator Norris is not a voting member because he is not present. Legislator Weinbecker has been excused. Legislator Nortz is hopefully attending my conference call. Others present, the county attorney, the director of community services, the chair of the community services board, and the subject of this hearing, Mr. Wyatt White. The county manager, the corporate board. Do you have anybody with you? Why are you by yourself? The procedure to be followed is this proceeding is being recorded and the transcript of the proceeding will be made available to Mr. Wagner. Witnesses from the CSB board will be referred to Mr. Wagner having an opportunity have an opportunity to present his response to the charges, testimony, and exhibits presented, and call any witnesses on his behalf. I remind all that this is not a criminal or a court proceeding, but a hearing based upon an appointment to and potential removal from the CESB. I will require that all testimony be relevant, brief, and to the point. At this time, I request that Joan Nichol, the county attorney, proceed with the hearing of the board.

3:21 - Conference Room (JM) - Speaker 3
Thank you, Mr.

3:22 - Conference Room (JM) - Speaker 1
Chairman. If it's okay, I'm just going to remain seated here because we'll have to go back there. So pursuant to Mental Hygiene Law 4111F, the Board of Legislators may remove a board and or subcommittee member of the Community Services Board for cause after written notice of the charges and an opportunity for that person to be heard. Pursuant to resolution 3-2025, the community services board voted to recommend to this board of legislators to remove Wyatt Wagner from all positions on the CSB board subcommittees and any designated leadership positions therein. On behalf of the board, I cause the notice of this hearing with the notice of charges to be served upon Mr. Wagner, and in addition to an affidavit of service, a personal service, Mr. Wagner himself acknowledged receipt of that when he sent me an email, so I appreciate that. I am offering, and the board has before it, six exhibits,

identified A through F. Mr. Wagner and each legislator that's been provided with a copy of those exhibits which are deemed to be put into the record from today's hearing. Exhibit A is the notice of hearing and the charges with an attached transcript of Mr. Wagner's privilege of the floor statements at the Community Services Board meeting on February 14th. Exhibit B is Mr. Wagner's signed application to the CSB in 2022 applied to become a member of the board. Exhibit C is Resolution 3, 2025 of the CSB. Exhibit D is an email from Mr. Wagner on January 14th to the Director of Community Services, Anna Plax, and the Executive Director of the Youth Board. Exhibit E is Mr. Wagner's of February 8th to the Board of Legislators, the Community Services Director, the Commissioner of Social Services, the Executive Director of the Youth Board, the County Manager, and employees of the Office of Children and Family Services in in the

5:55 - Unidentified Speaker
state of New York. In that last exhibit E, Mr.

6:02 - Conference Room (JM) - Speaker 1
Wagner was complaining about the youth bureau and demanding removal of various youth board members, anyone over the age of 18 actually, compensation of $50,000 for damages and consequences if none of his demands were met. Exhibit F is Mr. Wagner's February 24th email to me, the county manager, the director of community services, the chair of the CSB, and the chairman of this board, Larry Dalla, with his response to the charges and the threat of liability by a lawsuit All of these exhibits and the testimony the board will hear today support the CSB's request to have this board remove Mr. Wagner from the positions on the CSCB due to his failure and inability to maintain professional and respectful boundaries and rapport and relationships with other community partners stakeholders, which is essential to the workings of the Community Services Board in order for it to meet its responsibilities and missions to the community. Unfortunately, Mr. Wagner demonstrated an inability to use good judgment and leadership skills required of the CSB member and expected of the CSB member over the course of the incident. Specifically in Exhibit B, his CSB application, which he signed, it states that were set forth in the notice of charges. It is important that members be in good community standing and that there be no ethical issues that would harm consumers and or stakeholders or detract from the work It further goes on to state, it is important that those served not be encumbered by undue stress and relational issues. And furthermore, in that application, the signer agrees to maintain professional boundaries and rapport. There's also a statement in there that you agree to maintain confidentiality. The incidents that we set forth in the notice of charges based upon the information received by the Community Services Board demonstrate that Mr. Wagner unfortunately was not able to abide by those expectations in conduct. And in support of the charges themselves and the exhibits that have been submitted, I would now ask the board to hear the Director of Community Services. And I would ask the Clerk of the Board to sway her in. Can you raise your right hand, please?

9:26 - Conference Room (Cassandra Moser) - Speaker 6
Do you affirm under penalty of perjury that the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

9:47 - Conference Room Anna Platz (hereinafter "AP")- Speaker 1

So, you're currently the Director of Community Services, correct? Yes. And immediately prior to that, you were appointed by this board as the Interim Communities Director. Correct. Did you serve on the Community Services Board before becoming its director? Yes. For how long?

**10:10 - Conference Room (AP) - Speaker 3**
Approximately two years while I was employed.

**10:14 - Conference Room (JM) - Speaker 1**
And are you familiar with Wyatt Wagner? Yes, I've worked with him on the board for a little over two years.

**10:22 - Conference Room (JM / AP) - Speaker 3**
I'm just going to ask you to speak up because we're recording. Yes, I've worked with Wyatt on the Community Services Board for a little over two years now. Do you know when he was appointed to the board? He was appointed on October 4th, 2022 to serve a term from October October 5th, 2022 to December 31st, 2025.

**10:47 - Conference Room (JM / AP) - Speaker 1**
I've left on the table next to you a copy of the exhibits. Are you familiar with the application form that Ryan, that Mr. Wagner filled out? Yes. Did he execute that form? In your presence or was it before someone else?

**11:15 - Conference Room (AP) - Speaker 3**
This form was executed when Pat Freilich was the Community Services Director, so I believe she was the original recipient of the application.

**11:26 - Conference Room (JM) - Speaker 1**
And is that a standard form that all applicants to the CSB would fill out?

**11:33 - (AP)**
Yes.

**11:33 - Conference Room (JM) - Speaker 1**
To you as a director, what's the significance of that form? And the fact that any applicant fills it out.

**11:43 - Conference Room (AP) - Speaker 3**
I think it first demonstrates an individual's interest and commitment to serving Lewis County in this capacity. This board is unique. It's an opportunity for people to share why they're interested in serving in this capacity. And really, truly that in addition to potentially a resume is our first opportunity to get to know someone that we could be working with for a significant period of time.

**12:18 - Conference Room (JM) - Speaker 1**
And is there anything of significance in that form in relation to the charges that we have here today?

**12:26 - Conference Room (AP) - Speaker 3**
Yes. In the form, potential applicants, community services board or subcommittee

members are asked to attest and agree to maintaining professional boundaries and rapport, as well as their commitment to being in good community standing. They attest to the fact that there are no ethical issues that would harm consumers of our services or any stakeholders that we work with. And also importantly, it's an opportunity to say that they will not engage in part in activity that would detract from the work of the board or the subcommittees, and that if something like that happens, they will let the Director

13:12 - Conference Room (AP / JM) - Speaker 1
of Community Services know. Okay. So, did there come a time in the beginning of this year that you learned of an incident involving Wyatt and the Copenhagen School District?

13:26 - (AP)
Yes.

13:26 - Conference Room (JM / AP) - Speaker 3
When did that occur? I was notified of the incident on January 14th.

13:32 - Conference Room (JM) - Speaker 1
How were you notified?

13:34 - (AP)
Wyatt informed me via email.

13:37 - Conference Room (JM) - Speaker 1
And were you the only one on that email?

13:41 - (AP)
No. He also included Caitlin Lawler.

13:45 - Conference Room (JM) - Speaker 1
She is the Lewis County Youth Bureau Director. And I believe that's Exhibit D for the board's knowledge. So on January 14th, did you have in communication with Blythe?

14:00 - Conference Room (AP) - Speaker 3
I did not respond. Yes, that was the same day of our January community services board meeting. OK.

14:10 - Conference Room (JM) - Speaker 1
Did you have that email from him when you started the CSB meeting?

14:17 - Conference Room (AP) - Speaker 3
Yes, it came about 45 minutes prior.

14:21 - (JM)
Had you reviewed it?

14:23 - Conference Room (AP) - Speaker 3

I honestly don't remember.

14:25 - (JM)
OK.

14:26 - Conference Room (JM / AP) - Speaker 1
So did you have any communication with Wyatt at the meeting about that, the Copenhagen incident? No. What, if anything, happened at that board meeting that caused you some alarm?

14:42 - Conference Room (AP) - Speaker 3
During our community services board meeting, Wyatt asked to speak during privilege of the floor. And that is, I would say, uncommon for board members. Occasionally we will have contract agency participants, meeting participants, share information at that time. But it is uncommon for a voting member of the community services board and appointed member of the board to speak during privilege of the board.

15:19 - Conference Room (JM) - Speaker 1
that meeting recorded, so you had the transcript from his statement to the board, is that correct?

15:25 - (AP)
Correct.

15:26 - Conference Room - Speaker 3
I used the Read AI tool to assist with taking accurate notes.

15:30 - Conference Room (JM) - Speaker 1
And for the board, I'm just going to remind you that that's attached to the notice of the charges and Exhibit A, the actual transcript.

15:40 - (JM)
So, Ms.

15:41 - Conference Room (JM) - Speaker 1
Platts, I reviewed the transcript and I have to say that for the first five or so paragraphs. I didn't find anything that was necessarily inappropriate. However, after that, I wonder if you had, what your view was having reviewed that transcript about Mr. Wagner carrying on about CPS and his personal family's struggles with CPS. And drugs and family status?

16:18 - Conference Room (AP) - Speaker 3
I was very confused by the shift in Wyatt's statement. I thought it was inappropriate to be discussing such a personal matter in such a public place. Our meetings are public. There's board members and other community agencies present at the table. And also, I was confused. Child Protective Services is not a program for a department that falls under the Community Services Department. So I was very confused as to why this issue was being brought up in this particular setting.

17:12 - Conference Room (JM) - Speaker 1

At that meeting, did you and any of the board members have an opportunity to talk about the statement that he read into the record?

17:22 - Conference Room (AP) - Speaker 3
Karen, as community services board chair, she acknowledged his words and shared with the board that she would meet with me after to discuss next steps. Okay.

17:34 - Conference Room (JM) - Speaker 1
And did you have that meeting with her? I did.

17:39 - Conference Room (AP) - Speaker 3
What did you discuss? I reached out.

17:47 - Unidentified Speaker
Well, actually.

17:49 - Conference Room (AP) - Speaker 3
I shared with Karen that the Children's Home of Jefferson County had reached out to after the board meeting to express their concern about what Wyatt said, specifically the lack of youth services. And I told Karen that I provided Wyatt with copies of all of the resources and information that I had shared with him that was provided to me by the Children's Home to reaffirm that they heard what he was saying, that they are taking actions, They wanted to make sure that he knew what resources were currently available, and also what they had in progress for 2025.

18:45 - Conference Room (JM / AP) - Speaker 1
And let me just ask you something about how the CSB runs its meeting. You're the director. Is part of your job to run the meetings? Yes, I contribute. Is part of your job to schedule the meetings?

19:02 - (AP)
I schedule the meetings.

19:04 - Conference Room (AP) - Speaker 3
and the secretary for the meetings. I work with the chairs of the board and subcommittees to prepare the agenda and any necessary presentations and scheduling.

19:14 - Conference Room (JM / AP) - Speaker 1
And if there is a special meeting called, who calls that meeting? The chair of the community services board. And were you asked to set up a special meeting by the chair? Yes.

19:32 - Conference Room (JM / AP) - Speaker 1
I noticed in the email that he sent to you and Caitlin Lawler that towards the end he said, well, he said he wanted to talk to you about an incident that just occurred and that was the incident at the Copenhagen School? Yes. I noticed that he indicates that he was reaching out to you and Caitlin because he trusts the two of you and trust both of your judgments. Do you remember that? Yes. That's on the last page of that email. And two weeks later, were you included on emails where he was asking for Caitlin Lawler to be removed as the Executive Director of the Youth Bureau?

20:20 - Conference Room (AP) - Speaker 2
Yes.

20:27 - Conference Room (JM) - Speaker 1
So did you have any communication directly with Wyatt then after that CSB meeting on January 14th about what happened at Copenhagen School?

20:39 - (AP)
Yes.

20:39 - Conference Room (JM) - Speaker 1
What did he tell you?

20:42 - Conference Room (AP) - Speaker 3
He gave me an overview of the situation. He was there tabling for his nonprofit, Youth of Lewis County, share resources and the services being he providing. My understanding is then that while he was there tabling during lunch hour he was asked by the superintendent of schools to leave.

21:10 - Conference Room (JM) - Speaker 1
Did Wyatt tell you why he was asked to leave?

21:16 - (AP)
No. He shouldn't be there. He was asked multiple times to leave.

21:23 - Conference Room (JM) - Speaker 1
to learn at some other point in time the reason why he was asked to leave?

21:31 - (AP)
Yes.

21:31 - Conference Room (JM / AP)- Speaker 3
So what did you learn? That there was a prior incident involving Wyatt and the Copenhagen School administration that we ended on good terms.

21:42 - Conference Room (JM) - Speaker 1
Do you know if he was told not to come back to the school?

21:49 - (AP)
Yes.

21:49 - Conference Room (JM / AP) - Speaker 1
So having all of that that information, did you confer with the chair of the community services board? Yes. And did you decide, or did the chair decide that there should be a special meeting to address this?

22:07 - (AP)
Yes.

25:10 - Conference Room (JM) - Speaker 1
It's all in the context of mental health and development.

25:14 - Conference Room (AP) - Speaker 3
Yes, there are specific programs and services that we contract with agencies for that.

25:19 - Conference Room (JM / AP) - Speaker 1
So all the information from emails that you received as well as this board pertaining to the Youth Bureau and the changes that Mr. Wagner wants to see at the Youth Bureau really had nothing to do with the community services Is that true? Is that fair? Correct.

25:39 - (JM)
Okay.

25:39 - Conference Room (JM) - Speaker 1
And would you say that by sharing all of that information and involving the Community Services Board, that was another demonstration of lack of judgment as to who should be receiving those emails?

25:55 - (AP)
Yes.

25:55 - Conference Room (JM) - Speaker 1
I don't have any other questions if any of the board members have any questions. If not, I'll let Wyatt, if you want to come up and ask some questions.

26:30 - Conference Room Wyatt Wagner (hereinafter WW) - Speaker 2
familiar with the CSB's LGU core rules, right?

26:34 - Conference Room (AP) - Speaker 4
Yes.

26:34 - Conference Room (JM) - Speaker 1
You're going to have to speak up a little bit.

26:39 - Conference Room (WW) - Speaker 2
Do we advocate for clients with the public, local, and state policy makers in the community as a whole?

26:48 - AP
Yes.

26:48 - Conference Room (WW / AP) - Speaker 2
So everyone, pretty much? Yes. And we develop cross-system solutions for gaps in the hygiene systems?

26:56 - (AP / WW)

Yes. Would you have considered leaving sharing other stories about CPS that I have learned about through my advocacy work as a youth care advocate in violation of HIPAA?

27:10 - Conference Room (WW) - Speaker 2
If I had shared other stories of issues that did relate to the CSB's stuff.

27:18 - Conference Room (JM) - Speaker 1
It would depend upon what kind of information you were disclosing if you're going to talk about HIPAA. Let's try to keep it focused on why we're here.

27:34 - Conference Room (WW) - Speaker 2
When you worked at public health, did you work closely with Scott during COVID? Scott who?

27:45 - Conference Room (AP) - Speaker 1
Yes, I communicated with him quite regularly.

27:49 - Conference Room (WW / AP) - Speaker 2
Do you feel like that could pose a conflict interest when I shared the conflicts I was having with Scott? No. No. Do you consider the information that I shared with you regarding the trespass confidential?

28:19 - Conference Room (AP) - Speaker 3
No. I and the community services I serve at the pleasure of the Community Services Board and the Board of Legislators. And you told me about if you did adhere to what you said you would do in the application as far as letting me know if an incident occurred, that was potentially kind of the language in front of me. If an issue came up that would potentially interfere with our work, but as the Director services department. It's my duty to inform the chair of the board that I also that in addition to this board.

29:02 - Conference Room (WW) - Speaker 2
Do you feel like when you shared it with so many people, it became less confidential when it was an ongoing legal matter that I shared with you?

29:15 - Conference Room (AP) - Speaker 3
My concern was not with your legal matter. My concern was with the behavior that led to the charge being made and the conduct you've participated in since.

29:28 - Conference Room (WW) - Speaker 2
And how did you validate the behavior that led to the charge if the charge itself is relying on those behaviors?

29:36 - Conference Room (AP) - Speaker 3
Can you say that again?

29:38 - Conference Room (WW) - Speaker 2
How are you, like, finding those behaviors to be true based off what Scott Connell is saying if the charge itself is relying on those behaviors yet to be found guilty.

29:52 - Conference Room (AP) - Speaker 3
It's my understanding that you were asked to leave school grounds and didn't leave immediately upon being asked.

30:00 - Conference Room (JM) - Speaker 1
I'm going to have to both speak up.

30:04 - Conference Room (AP) - Speaker 3
It's my understanding that you were asked to leave school grounds and did not leave immediately upon being asked.

30:14 - Conference Room (WW) - Speaker 2
Does Copenhagen School receive the future stories grant?

30:18 - Conference Room (AP) - Speaker 3
No, Thrive Wellness and Recovery receives Future Stories grant funds.

30:24 - Conference Room (WW) - Speaker 2
What about the youth care?

30:27 - Conference Room (AP) - Speaker 3
Yes, they have received Future Stories grant funds.

30:31 - Lawrence Dolhof
Can I just ask one question before we get too far off it?

30:38 - Conference Room (LD) - Speaker 4
So you were asked to leave the school January 14th, whatever the date is. And you left then, and then you subsequently came back another time, or it's all the same? You just refuse to leave. It's a very complicated issue.

30:56 - Conference Room (WW) - Speaker 2
Do you want me to explain it now or later?

31:00 - Conference Room (JM) - Speaker 1
I think we're going to give him an opportunity to address the board directly. And that might be the time where you can go through all of those.

31:10 - Conference Room (WW) - Speaker 2
And I have emails and stuff from the school as well.

31:14 - Conference Room (JM) - Speaker 1
So in any event, we just really want focus, if you have any other questions for Anna on the testimony that she's provided or anything related to the charges. If you want to stay, you can. So if you don't have any other questions, we'll excuse Anna, and then I would ask Karen Bolliver to step up. She just I have a few questions for her.

31:41 - Cassandra Moser
Would you please raise your right hand?

31:45 - Conference Room (Cassandra Moser) - Speaker 6
Do you affirm under a penalty of perjury that the testimony you are about to give is
the truth, the whole truth, and nothing but the truth?

31:59 - Karen Boliver (hereinafter "KB")
I do. Be careful.

32:01 - Conference Room (JM) - Speaker 1
So you are the chair of the CS group, correct? How long have you been a chair?

32:08 - Conference Room (KB) - Speaker 5
Since January 2023.

32:09 - Conference Room (JM) - Speaker 1
And prior to that, were you a member of the CSB?

32:13 - Conference Room (KB) - Speaker 5
I began my work in 2001, and I have been a member of all subcommittees, on and off,
as long as I could have the term.

32:23 - Conference Room (KB / JM) - Speaker 1
And then I'd get down, and then wait and get it back on. You're going with the
punishment. Yes, I am. Change comes slow. And what's your day job?

32:34 - Conference Room (KB) - Speaker 5
I am the Associate Director at Northern Regional Center for the Pandemic.

32:40 - Conference Room (JM) - Speaker 1
Who decides to hold special meetings for the CSB?

32:44 - Conference Room (KB) - Speaker 5
I do.

32:45 - Conference Room (JM / KB) - Speaker 1
Did you request a special meeting regarding the incident with Wyatt? Yes, I did. And
did you direct Anna Platz to schedule that meeting and give notice of it?

32:59 - (KB)
Yes.

32:59 - Conference Room (JM / KB)) - Speaker 1
Did you have any conversation with Wyatt around that time of the CSB meeting,
January 14th, about what happened at the Copenhagen school, directly with him? Okay,
you have to speak up. Yes. Yes, okay. And can you tell us what you remember from
that conversation?

33:18 - Conference Room (KB) - Speaker 5
Yes, I know I had called my phone and I was in a meeting, so when I got back I
listened to it and he sounded upset and wanted to talk and I did not call him. And

as I was working on some other reports, he came to my office and said, can you talk? And I said, what's going on? And briefly told me an overview of what had happened at the school. And I said, you were asked to leave the school?

33:48 - (KB)
Quite puzzled.

33:48 - Conference Room (KB) - Speaker 5
And again, I didn't have all the story. I didn't know all the facts of what had happened before. I didn't know you had been employed and left and any of that. So then he asked for my And I said, I can't give you any advice because I've never encountered any of this before. I worked at the school. Again, I was a family peer advocate when I started, so I had a relationship with every school district in the county and had never been asked to leave the school district. So I just couldn't fathom it all. And I just thought to myself, I had to do more about it. And as I teach, choices have consequences. And I just thought, well, and we'll see where this goes.

34:31 - Conference Room (JM / KB) - Speaker 1
And is that part of the reason why you scheduled a special meeting? So that you could hear what actually went on? And at that executive session meeting that the CSB held, did you allow Wyatt to explain himself and the events of that, what happened at the school?

34:50 - Conference Room (KB) - Speaker 5
I thought we were very generous with time. We met over an hour.

34:54 - Conference Room (JM) - Speaker 1
And did he relay the the fact that he had been asked to leave the school prior to that January date?

35:03 - (KB)
At that meeting? Yeah. I'm sorry.

35:06 - Conference Room (JM) - Speaker 1
But at some time, did you learn that he had been asked to remove prior to that date from the school?

35:15 - Conference Room (KB) - Speaker 5
And I believe I may have had a conversation and said, did you let Mr. Connell know you were coming back in? And he said, it doesn't matter, I had an approval with the guidance counselor. And I said, but the guidance counselor probably doesn't know what had happened prior, so you should have cleared it first. Because that's super, they're ahead of the castle, right?

35:43 - (KB)
They're the lead.

35:44 - Conference Room (JM) - Speaker 1
After having that executive session, did you form an opinion as to whether you, as

the chair of the community services, or felt that his conduct and behaviors warranted removal by the CSB.

36:00 - (KB / JM)
Yes. Why is that?

36:02 - Conference Room (KB) - Speaker 5
The professionalism of our work on that community is a reflection of all of our actions. And we have to be professional. And if we have personal opinions, they have to be within a variable of, It's not our personal, it's our vision for the community to make it a better place.

36:32 - Conference Room (JM / KB) - Speaker 1
And was the vote unanimous? I believe it was. I don't have any other questions. Any of the other board members have any questions? Go ahead. Thank you, Tammy. You're welcome. Wyatt, you now have an opportunity. You get to sit in the big chair. And the clerk of the board is going to speak.

36:59 - Conference Room (Cassandra Moser) - Speaker 6
Would you please raise your right hand? Do you affirm under a penalty of perjury that the testimony you're about to give is the truth, the whole truth, and nothing but the truth?

37:12 - Wyatt Wagner
Yes.

37:12 - Conference Room (JM) - Speaker 1
So, Wyatt, you can make your statement if you want, or I can ask you questions. For you to decide how you want to respond, but if you want to tell the board, make a statement, go ahead.

37:26 - Conference Room (WW) - Speaker 2
I first just kind of want to introduce myself, because most of you probably don't know who I am, other than what you've heard from here today. So I kind of wrote it down on paper. My name is Wyatt Wagner. I'm a 21-year-old youth advocate, nonprofit leader, and a lifelong learner, shaped by adversity, seriousness, and belief that systems can I was born in Missouri to a military family. I grew up navigating constant change. By age 13, I lived in six states and South Korea. As my father deployed overseas and my mother battled addiction, those early years taught me resilience. I learned to advocate not just for myself, but for my siblings and others filled by systems that prioritize paperwork over people. Today, I channeled resilience into building a stronger Lewis County. As a direct support professional, at DPAO, I empower individuals with developmental disabilities to claim independence. As a credentialed youth peer advocate, I guide teens through anger management and trauma using strategies borne from my own journey. And as founder of Youth of Lewis County, I've created a youth-led platform for change, ensuring young voices shape the policies affecting our community. In 2022, I was appointed to the Lewis County Community Service Authority and its Developmental Disability Subcommittee where I've worked to expand mental health resources and bridge gaps in care. My advocacy stems from first-hand knowledge. I've seen how mismanaged systems

like CPS fail families, how addiction destabilizes households, and how bureaucracy can silence those it's meant to protect. When I spoke up about these issues, whether advocating for youth services, demanding accountability for school safety, or challenging agencies to act, I was met with silence, deflection, or attempts to dismiss my voice. I'm a full-time student at Western Governors University, and I'm completing a DSP migrant credential at JCC. I recently concluded my term on the Governor's Youth Council, where I represented Lewis County, and I'm awaiting confirmation for the New York State Council on Developmental Disabilities from the Governor's office. I recently announced that I'm running for District 3 So if I may, let me just point out a few points.

40:09 - Conference Room (JM / WW) - Speaker 1
you sent some emails to this board on March 3rd to Anna Platz, to Karen, to Caitlin Lawler from the Youth Bureau. And you stated in your statement that the incidents being used against me are to relate but directly related to issues that began with Copenhagen School and my good faith report of potential corporal punishment. Okay. That is not the incident that happened in January of 2025, correct? No. This was an incident that happened back in October of 2024.

40:57 - (WW)
November.

40:58 - Conference Room (JM) - Speaker 1
November of 2024, a few months before. And you were at that time working with the 4-H club at Copenhagen School, and you felt that the way the phys ed teacher dealt with a particular class was corporal punishment in your mind because they had to walk, they had to do some miles or whatever. You went to the, you spoke to the superintendent about that, right?

41:27 - Conference Room (WW) - Speaker 2
So I first spoke to my supervisor who dismissed it, and then I was, I actually walked into the hallway with one of the kids to go pick up the milk and actually brought one of the kids that were involved

41:43 - Conference Room (WW) - Speaker 1
in it to explain it to the superintendent.

41:46 - (JM)
Okay.

41:46 - Conference Room (JM) - Speaker 1
And the follow-up with the superintendent was that they didn't find anything was inappropriate. I'm summarizing, okay. That may not be the term that you use, but the bottom line is they felt that there was nothing was inappropriate or that had to be addressed, you just, you then went to the school board, correct? About the same matter. And after a certain period of time is when the superintendent then told you not to come back to the school, correct?

42:18 - Conference Room (WW) - Speaker 2
He didn't tell me not to come back to the school.

42:22 - Conference Room (WW / JM) - Speaker 1
He never specifically came to me and told me anything. So, because in other emails that you circulated amongst many people in boards. You said that you thought just because you were banned in November. I wasn't banned. Or you were told not to come back to the school, right? I also wasn't told not to. So what were you told?

42:47 - Conference Room (WW) - Speaker 2
I was informed by my supervisor at Cornell that they no longer wanted me to work as a Cornell employee there.

42:56 - Conference Room (JM) - Speaker 1
Okay. Specifically the words that your employer used? So, you thought it was okay to go back to that school, having had this whole altercation a few months earlier, and to go back there without, as Karen indicated, that you didn't think through to tell the superintendent that you were going to be back school, right?

43:26 - Conference Room (JM) - Speaker 2
It didn't occur to you to do that?

43:31 - Conference Room (JM) - Speaker 1
Okay, so do you foresee that in the CSB's view in their sending something to this board to take action that they thought maybe you didn't show good judgment?

43:50 - Conference Room (JM) - Speaker 4
Okay.

43:52 - (WW)
Yep.

43:53 - Conference Room (JM / WW) - Speaker 1
You've also sent a couple of emails, and they're in the exhibits, where you are telling the director of CSB, along with this board, and OCFS, and other people, and the commissioner social services that the executive director of the youth board should be terminated. Due to the misconduct of PIP that she had enforced based on- Yeah. Something totally not for the CSB. That's not an issue for the CSB, is it?

44:39 - Conference Room (WW) - Speaker 2
I believe it was after she had received emails and I had received emails from multiple parents and we had requested and how it was affecting their mental health.

44:53 - Conference Room (JM) - Speaker 1
And also in your emails, you talk about you were being a whistleblower.

45:01 - Conference Room (WW) - Speaker 2
When were you a whistleblower? By reporting what Caitlin did and then reporting the issues at the school.

45:13 - Conference Room (JM) - Speaker 1
So also in your emails, to this board and others on March 3rd, you indicate that

your own therapist has advised that you reduce your responsibilities. Did you have that discussion with your therapist?

45:28 - Conference Room (WW) - Speaker 2
Yes, because of all the issues with the community services board and the youth bureau were bringing up things that I didn't expect. I'm asking for advice. All right.

45:41 - Conference Room (JM) - Speaker 1
I don't have any other questions. Are there any other statements or anything that you want to go through with this board before they, unless they have other questions for you and then they're going to deliberate?

45:57 - Conference Room (WW) - Speaker 2
So, the trespass issue seems to be the big thing for this. And back in November, I was working as the 4-H for fourth graders at Copeland. Can you hear him? Can you speak up? I was working as a 4th grade teacher at Copenhagen. And the day prior, we were utilizing a blow-up volleyball, which the kids got in trouble for us utilizing it. And the next day, a bunch of the kids came to me and reported that their gym teacher had singled them out moved out as the 4-H group and made them walk during gym class separate from the other students. And it wasn't just one or two, it was all of the kids. And then they had other kids coming up and making fun of them for it. So, I attempted to report it to my supervisor who just dismissed it. And then I I was bringing one of the kids with me to pick up milk, because we always trade it out every day. And we happened to have seen Scott Connell in the hallway, so it was a convenience. And we just stopped and had the kid explain it to him. Less than 30 minutes later, the principal comes down and just talks to the kids and tells them how it was a misunderstanding. And I still just felt like the issue was not being addressed properly. So I sent an email to them and the school board, and I never received anything back. And so when I received nothing back, I went to Scott's office. I asked his secretary if I could talk to him, and went in there, and then he just started getting super mad at me for including the school board in the email.

48:03 - Conference Room (JM) - Speaker 1
Did you understand the significance of that, his concern with you involving the school board? Could you appreciate that?

48:13 - Conference Room (WW) - Speaker 2
I feel like there's accountability in it.

48:17 - (JM)
OK.

48:18 - Conference Room (WW) - Speaker 2
I feel like there's nothing wrong with including the higher powers there, especially when the issue is not being addressed after multiple attempts to get it addressed. And according to New York State education law, what they had reported to me would be considered corporal punishment, which, I mean, there's plenty of examples of it. Teachers complaining that they can't make students walk during recess and stuff because they're in trouble. It fell under what I was supposed to do as a mandated

reporter, and it was not getting a formal investigation at all. So I kept pushing until he called my boss at Cornell and had me reassigned. And ultimately I just didn't want to work at Cornell anymore. I just thought me getting recommended for that. So I was also working part time at DPAO and switched to full time there. And the distance to travel was too far with my girlfriend and I sharing So I wasn't involved in Cornell anymore when I went to the school in January. And I really feel it was my obligation to ensure that there was Scott knowing that I went through the guidance counselor like I'd done previously. After the incident, I filed a FOIL request to see if there was any incident reports based off what he was saying about my behavior. There was nothing. I have all the documents I'm willing to provide to you guys, but it really just felt like retaliation for doing my duty as a mandated reporter. And now all of these issues have led to this, and I feel like no one It's letting the issues at hand play out to see who's in the right and who's in the wrong before making a decision on me. And I feel like it's just unfair to just ultimately believe whatever Scott is saying before the investigations are over because I haven't been found guilty yet.

50:49 - Conference Room (JM) - Speaker 1
Well, I can tell you that as an attorney and my recommendation to this board is that the status of any charge against you is not material to this decision. It's about the conduct and behavior that we put forth in the charges. That trespass has nothing to do with anything.

51:10 - Conference Room (WW) - Speaker 2
>>:I guess it's just confusing then because the trespass is where all the stims are, including the P.P.

51:17 - Conference Room (JM / WW) - Speaker 1
>>:No, I would disagree with that. Wyatt, and I'm going to say this, you know, in front of the board, it was your behavior and how you handled it. That is the issue for the CSCB and for this board. It has nothing to do with, you know, whether or not you were charged with anything and how that is resolved. It's just a matter of how you're presenting yourself to these stakeholders and to all these people and entities with whom the CSB and you're dragging in the youth bureau, and you're dragging in others, and that's why it's become problematic in my mind, and that's my recommendation to the board. This is where I keep getting confused, because you know, when I look at the hearing, everything's going back to the trespass.

52:10 - Conference Room (WW) - Speaker 2
The PIP goes straight back to the trespass. The PIP would have never...

52:15 - Conference Room (JM) - Speaker 1
We... This board doesn't care about the PIP. That's not before us. This is the CSB. That's a different matter. That's the youth bureau. And you're the one who brought them both together before this board. You know, it didn't have to be that way. It's just how you're functioning as a member of this community services board, which is something very near and dear to this board's heart. They are the, the appointing agent, they created the local governmental unit, which is the Community Services Board. And they wanted to succeed, and it has been working for a long time. It's the first time anything like this has come up, so.

53:05 - Conference Room (WW) - Speaker 2
Yeah.

53:05 - Conference Room (JM) - Speaker 1
You're gonna throw her under the bus now? Like you did Caitlin Lawler? I'm sorry if I'm asking but you know, let's finish your statement. This board has another meeting at five o'clock. Finish your statement so they can wrap it up in delivery.

53:24 - Conference Room (WW) - Speaker 2
Every meeting I've had about this so far has been an interrogation rather than looking at the facts of the situation. Anna and the Community Service Board did not look at the facts of the situation that led to what has happened. If ultimately in the beginning everything that happened and I was asking for advice, and I'm not getting that advice, when you guys are telling me I'm being unprofessional, how am I supposed to be professional if I'm asking for advice and I'm not getting it? And then you keep saying it's not about the trespass, but the actions that are happening are coming straight from this trespass issue, and they're justifying my actions based off what Scott is saying on my actions, but I have not been found guilty actions, and there's been no factual evidence to show that.

54:15 - Conference Room (LD / WW) - Speaker 4
Well, hold it just a second, because I'm kind of confused here. So the first time you were in Copenhagen School, you were in the official capacity of Cornell Cooperative Extension. Yes. Whatever happened behind me, the superintendent made a call to Cornell Cooperative Extension and asked that we not be there.

54:38 - (WW)
Yes.

54:39 - Conference Room (LD) - Speaker 4
Then you took it on yourself to go back to the school with no official capacity.

54:47 - Conference Room (WW) - Speaker 2
No, I went there as the representative of the youth of Lewis County, my non-profit.

54:55 - Conference Room (WW) - Speaker 4
We were tabling.

54:57 - (LD)
Okay.

54:57 - Conference Room (LD) - Speaker 4
There are actually, is it just you or is this a board? It's an official non-profit. It's a 501C.

55:07 - Conference Room (LD) - Speaker 2
It has its own board.

55:10 - (WW)

Yes.

55:10 - Conference Room (LD) - Speaker 4
It's not just you.

55:12 - (WW)
No.

55:13 - Conference Room (WW) - Speaker 2
I'm the only official volunteer at the moment, but we did just get...

55:19 - Conference Room (LD) - Speaker 4
So did you ask the school as a representative of that board if you could re-enter the school? I asked.

55:29 - (LD / WW)
Did you just show up? I asked the guidance office. Requested permission to go weeks ahead. I was not purposely trying to circumvent the superintendent.

55:41 - Conference Room (WW) - Speaker 2
I didn't feel that I was banned. I was just asked to be reassigned to not work as a 4-H educator there.

55:51 - Conference Room (LD / WW) - Speaker 4
You don't feel you were pushing the envelope by showing up there after you already had an altercation with the superintendent? No, I don't.

56:03 - (WW / LD)
I feel like there's a difference between professional disagreement and professional misconduct. I would agree with that.

56:11 - Conference Room (WW) - Speaker 2
And what Scott and I had was a professional disagreement, and he overstepped his powers by asking Cornell to reassign him.

56:21 - Conference Room (LD) - Speaker 4
But he is the CEO of that school, and he made the decision that he did not I want you to come back.

56:32 - Conference Room (WW) - Speaker 2
Based off of my report of misconduct, which should have had a formal investigation, which you never did. I do have one question.

56:42 - Conference Room (LD / WW) - Speaker 7
As of today, have you repaired your relationship with Copenhagen? I am really attempting to.

56:49 - Conference Room (WW) - Speaker 2
I have multiple emails that I've sent to the school board where I've tried to work with them and tried but I'm getting no response. And so I spent a month sending four

emails where I wanted to meet with them and work with them to figure out what is actually going on before I said that I was going to file the Department of Education investigation. So it's just been a lack of communication from other people. That's where I'm having issues is I can't effectively do what I need to if people are not willing to communicate with me. I really have been attempting to work with people on this and be negotiable and collaborative. And I understand the concerns here.

57:43 - Conference Room (LD / WW) - Speaker 4
Aside from all that, I view the Community Services Board as a key. And if that team doesn't, isn't comfortable with a member being on it, I would think that it might be in your best interest to resign from it. I don't know what I'm saying. Just my opinion. I feel like I keep getting turned around.

58:13 - Conference Room (LD / WW) - Speaker 2
Are you having thoughts along that line? I don't feel... What has happened is what our local government should be upholding with transparency and collaboration. And I feel like it's more important personally to allow you guys to make your decision based off of facts and what has been said here today and what I can provide from the school rather than just Well, aside from

58:49 - Conference Room (LD) - Speaker 4
all this conversation here, you know, I would say that if you're a member of the CSB board and your co-team doesn't feel that, if they feel that you're disrupted and you're not not really in the best interest of what the rest of the team is trying to move forward, then it's tough to be a player in that environment. Do you feel that your being on that board is accomplishing what the board intentions are?

59:43 - Conference Room (WW) - Speaker 2
I feel like a team... Are you following your own lead? That's how a board should be. There should be individuals making decisions based off of the knowledge that they have and then working as a team to implement strategies. But you shouldn't work as a team to make decisions entirely fully. You need to have individualistic ideas. If I have an opinion about something someone else does, it's good to have those debates and discussions. I think that's an important thing, and I will recuse myself from anything involving the Youth Bureau or Copenhagen School, but I don't have issues with any of the other schools, community things, or the county things.

1:00:34 - Conference Room (JM) - Speaker 1
Did you have documents you wanted to submit? Did you make copies? I have one. And is this all it? Yes. I will make copies for all the board members and we'll make this exhibit "G".

1:00:55 - Conference Room (Jessica Moser) - Speaker 7
Just for, I want this on the record, he's obviously said that that he is running for my district, so he and I will have an election in November. I do not feel I have a conflict, that's why I participated in the hearing, but I am not going to vote because I don't want it to appear as if I'm acting in a self-dealing manner. He's made comments about being silenced, so I don't want him to say that my vote was an attempt to silence him.

1:01:24 - Conference Room (Andrea Moroughan) - Speaker 1
I would just like to say I was a member of the Community Services Board for quite a few years. I've never seen anything like this. We all worked together. We all had respect for each other. And it was a productive time.

1:01:40 - Conference Room (Andrea Moroughan) - Speaker 5
And we did what we were supposed to do.

1:01:44 - Conference Room (WW) - Speaker 2
I think in the world we are in right now, things are very different. And there is a lot of issues going on. And I think you also have to recognize the generational difference between me and most of those board members as well.

1:02:04 - Conference Room (Andrea Moroughan) - Speaker 3
I am 20 more than you are.

1:02:07 - Conference Room (Josh Leviker) - Speaker 2
I'm not saying it's negative. I think it's important to have a generational difference. I'm just acknowledging that my viewpoints might be different than someone who is older than me. I think we should have a little bit of a difference. Hearing everything, and I will say why the trespass has no bearing in this board's decision or my decision for anything. It has no meaning in this matter. It's how everything was conducted amongst yourself, with Anna, and the CSB, and just convoluted, and you have your opinions and there can be debates, but it's how you portray yourself and to true people's opinions, and it's time to lose, and it's, working as a team, and I've been in, I'm only, I'm still young, compared to most, and being in a large corporation by myself, I'm very young, and I know, and went through those debates, I had to hold my tongue, watch what I said, we had to work together, and I think it's just maybe, it's not a good fit, a good team, Karen and Anna, to the professionals, they look out for the team. If it's not meshing and it cannot be amended, it's best for the team or group to go separate ways.

1:03:41 - Conference Room (Josh Leviker) - Speaker 1
And that's how I feel on that. So if there's nothing else, then I would recommend, Mr. Chairman, that hearing to be closed.

1:03:56 - Conference Room (LD) - Speaker 4
If there is no objection, we will close the hearing at this point.